MUNROE EDWARDS et al. vs. EDWARD DAVIS et al.—Appeal from San Augustine County.

Whether or not a particular tract or grant of land lies within the boundary line of the twenty frontier leagues, cannot be judicially known to the court.

The executive of the state of Coahuila and Texas, without the approbation of the president of the Mexican union, had no authority, under the laws, to grant lands within the twenty border leagues for the purpose of perfecting an inchoate claim to the same land previously acquired under the government of Spain. [*Ante*, 241; *Post*, 499; 10 Tex. 316; 23 Tex. 29.]

This action was commenced for the recovery of lands lying in the county of San Augustine. The petition states, in substance, that one Francisco Guerrero, in March, 1827, applied to

21

the political chief of the department of Texas, praying to have the boundary lines run, and a complete title made to him of a farm called the Attoyaque, which he had then in possession as his own property, having improved and cultivated the same. That, in conformity with the prayer of the said petition, and in compliance with official instructions from the governor of the state of Coahuila and Texas, reciting that having seen the petitions of various citizens of Nacogdoches, and, among others, that of Francisco Guerrero, praying to be put in personal possession of the lands they occupy, he had determined to grant said petitions, and required the said political chief to appoint some person of his confidence to survey the said lands, and put the petitioners in possession, and issue to them the corresponding titles, on condition of their paying the government dues, at the rates paid by new settlers or colonists under the laws of colonization, and that none of said grants should exceed eleven leagues of land. The said political chief did authorize and commission the alcalde of Nacogdoches to proceed, in obedience to the superior order of the governor, and put the parties mentioned, among whom was Francisco Guerrero, in possession of the lands petitioned for; to have the lines run, and to do all that was necessary before issuing corresponding titles to the land. That the said alcalde, on the 20th August, 1827, appointed a surveyor, and on the thirtieth of the said month, he proceeded with the said surveyor to the land designated; surveyed and marked the lines, in conformity with the said decree of concession, and the possession thereof, in due form of law, delivered to the said Guerrero, and executed to him a title with the usual legal formalities and solemnities. All of which would more fully appear by reference to the documents, orders, decrees, commissions, etc., etc., recited in the petition, and which are brought into court, ready to be produced and proven, and to which petitioners beg leave to refer. The boundaries of the said concession or grant are fully set forth.

It is averred that the said Guerrero sold to some of the plaintiffs all his right, title and interest in the said concession, with certain reservations specified in the deed of conveyance,

which deed was shown to the court; and that the other plaintiffs derive their titles from these first purchasers, and that the petitioners, having thus a legal right to the said grant or tract of land, took peaceable possession of the same. That the defendants afterwards ejected them from the premises, and still continue to deprive them of possession.

The petition was filed in February, 1839; and although, from the language of the petition, it might be imagined that the evidences of the plaintiffs' title were exhibited at the same time, yet they were not marked filed until 1847.

It will not be necessary to detail the pleadings of the parties, their various motions and agreements, from the commencement of the action in 1839, until the fall term of the court in 1847, when an amendment to the petition was filed by the plaintiffs. At the succeeding term the defendants excepted generally to the plaintiffs' petition for legal insufficiency, and filed several pleas by way of an amended answer, and the various exceptions of the parties to the pleadings of each, respectively, were, at the same time, considered and determined by the court.

Among the exceptions overruled was the motion of the plaintiffs to strike out the demurrer in the defendants' amended answer, and, the demurrer being sustained, judgment was consequently rendered for defendants. A motion for reconsideration was overruled, and an appeal taken.

WEBB and J. P. HENDERSON for appellants.

ARDREY for appellees.

Mr. Chief Justice HEMPHILL, after stating the facts, delivered the opinion of the court; Justice WHEELER not sitting, having been of counsel in the court below.

The admissibility of the demurrer in this cause, at the late stage of the pleadings, was not discussed before this court, and the only point raised in the argument was, whether there was error in sustaining the demurrer, and the consequent dismissal of the petition.

The first ground assumed in support of the judgment was, that in the deed of conveyance from Guerrero there were reserved certain portions of the land contained in his grant; and, there being no distinct averment that the ejectment was from that portion of the land transferred to the plaintiffs, there is, consequently, no exclusion of the inference that the plaintiffs may have been ejected from, and defendants may now be in possession of, the lands reserved to the vendor. That the facts in relation to the precise *locus* of the ouster are stated loosely, is obvious; but, notwithstanding the want of precision in the averments, there appears to be sufficient certainty in the pleadings to apprise the defendants and the court that the plaintiffs were claiming only the lands conveyed by the deed; and that the wrongs complained of, and the remedy prayed, were in relation to those lands, and not those still owned by the person from whom the purchase was made. They make profert of the deed, and it might be supposed that this document was in court from the commencement of the action. Under the laws of Spain, the ancient practice was, always, to present, with the petition, the evidence of right upon which the demand was founded. This was afterwards changed, and, ordinarily, instruments were not produced until offered in proof, unless inspection of them was demanded by the opposite party; and they were then required to be exhibited and annexed to the petition. [Gomez, Practica Forensica, p. 19.]

But, whatever may have been the proper practice at the institution of the suit, and whether the deed were filed or not at that time, it was, at all events, exhibited, and its contents fully known before the filing of the demurrer. The petition declares that Guerrero conveyed to some of the plaintiffs all his right, title and interest in the lands contained in the grant, with the exception of certain reservations expressed in the deed, and this, on inspection, shows the land embraced in the reservations. The subsequent averments, though sufficiently broad to cover all the lands contained in the grant, must be taken with the qualifications previously expressed and admitted, and be understood as having reference only to such portions of the grant

as they had claimed under the conveyance. If any of the defend-ants be on the reserved lands, they must recover on the title exhibited by the plaintiffs themselves, as this negatives any pretensions of the latter to a claim for such lands.

A further examination of this ground is not deemed neces-sary, and we proceed to the consideration of the main question in the cause, and which was fully and elaborately argued, and it is this, viz.: that the grant exhibited, being for lands lying within the twenty border leagues, could not have been legally made without the previous approbation of the supreme execu-tive of the union, and this not appearing, the grant is a nullity, and cannot support the action.

The argument on this ground proceeded on the supposition that the fact of the land being within the twenty frontier leagues was judicially known to the court. This position was asserted by counsel for the appellees; and though denied gen-erally by the appellants' counsel, yet in this case they did not regard it as of any importance whether the land lay within the border leagues or not, and the question was discussed as if such was the case in point of fact.

The boundary line of the twenty frontier leagues has not been surveyed or designated, and we are not of opinion that we can judicially know that the land lies within that territory [6 C. L. R. 413; 42 C. L. R. 913]; but as the argument has been based on that supposition, and there can be no doubt of its truth, we will proceed, as if that were the fact, to express our views of the legality of the title as it appears on the record.

The documents embodied in the title show that the maternal grandfather of the grantee had in his lifetime been in posses-sion of a rancho called the Attoyaque, about ten leagues to the east of Nacogdoches, without any title conveying property *(titulo de propiedad);* that his mother, after the death of the grandfather, made application, as one of his heirs, in May, 1810, to Salcedo, governor of the province of Texas, praying to be placed in possession of three leagues of the said rancho, de-scribing the portion for which application was made, a part of which had been cultivated by her son, Francisco Guerrero, the

grantee, subsequently, of the same land. The petition was referred to Don Mariano Mora, an inhabitant of Nacogdoches, whom the governor specially commissioned that he, accompanied by two assisting witnesses, should repair to the place designated, and review and survey the same, and report their quality and circumstances, their waters and the value, by means of a corresponding appraisement.

The commissioner, with attendant witnesses, having repaired to the lands, made an ocular inspection (vista de ojo) and survey of the same, and reported its quality and its appraised value, being the sum of sixty dollars. The report is dated on the 26th June, 1810.

There is no evidence that this report was received or affirmed by the governor, or of any other or further action on the claim by the public authorities under the government of Spain. On the contrary, the statements of the grantee in his application for title in 1827 show that no further action was had on the claim.

In his petition, after stating the order of the governor for the review and survey of the lands, he adds: "but my mother, in good faith, without soliciting the corresponding possession, remained to the date of her death as the owner of the said farm;" and he afterwards prays that "due possession may be given to him of the said farm with its boundaries."

From the evidence furnished by the title it is manifest that the possession by the ancestors of the grantee, and his own, up to 1827, had been without the express authorization of any public officer; for there neither accompanies the order of survey, nor is there, subsequent to the making of the survey, any of the customary orders securing the applicant in his claim or in his possession until the delivery of a full and formal title of possession.

It is clear that, up to the application for the grant in 1827, the property in the soil was still vested in the government, and that, consequently, it depended entirely upon the pleasure of the then existing authorities, whether their inchoate claim should be recognized and perfected into a title.

The claim was in the first stages of incipiency.

The statements and documents of the petitioner show that neither his grandfather, mother nor himself had received title—that there was no assent of the sovereignty to the possession — and that, consequently, not only the fee remained in the government, but the equities, arising from the acts of the former sovereignty, were of the most imperfect character, and those springing from inference and construction, and not from grant in express terms.

The land could not be said to be legally designated, as the survey, though made, was not returned to the executive as directed, nor approved; and there is no pretense that the party had title, the evidences of which were lost, or that the application was for a resurvey of lands imperfectly delineated, or for any purpose of a like character. The claim being inchoate, and the grant under the state being that of a new title, and not the revalidation or authentication of one formerly given. The question of the power of the state authorities to make such grant, without the previous approbation of the supreme executive of the union, presents itself for consideration.

The executive, in his order directing title to be made, did not consider himself as authorized to disregard, at least altogether, the laws on the subject of colonization, and to cede the lands on the terms of the original claim. He recognized no such obligation on the part of the existing government, and accordingly directed that if the government dues had not been paid, they should now be discharged, not in the amount of sixty dollars, the original appraisement, but at the rate of thirty dollars per league, the amount prescribed for new settlers; and that the land could not be granted according to the possible extent of the former survey, but only to the extent of eleven·leagues, the limit fixed by the laws of colonization.

There is not, perhaps, an entire conformity to these laws, but there is sufficient to show that, in the opinion of the executive, incipient claims against a formal government could be confirmed only so far as they were compatible with the laws

of the existing sovereignty for the distribution of the public domain.

This being an acknowledged principle, and inferable from the declarations of the governor, the pertinent inquiry then arises, whether the executive of the state, without the approbation of the president of the union, had authority, under the laws, to grant lands within the twenty border leagues for the purposes of perfecting the claim which was the foundation, or rather one of the meritorious considerations, of the grant before the court.

This subject has been fully examined, and the point, as to the authority of the executive, decided in the case of Goode *vs.* McQueen's Heirs, and it will only be necessary in this case to refer to the various provisions of the colonization laws to answer the above inquiry.

The 4th article of the national colonization law of 1824 declares that the lands comprehended within twenty leagues of the limits of any former nation, and ten leagues of the coast, could not be colonized without the previous approbation of the general supreme executive power.

The policy of settling foreign emigrants within the interior of the country had long been sanctioned by the Spanish government, as well in the mother country as in her . provinces of the Indies [see . L. 1, Tit. XI, Lib. 6, Nov. Recop. and L. 21, Tit. 27, Lib. IX, de las Leyes de Las Indias]; and, under the imperial government, the empresario, Austin, was authorized to settle families in addition to the first three hundred, but on the condition that they be established in the interior of the province adjacent to the ancient settlements.

But the federal government, in the general colonization law, advanced a step beyond this accustomed policy, and prohibited all colonization, whether by natives or foreigners, within the border territory.

This was, at all events, the original construction placed by the state of Coahuila and Texas on the article cited from the general law of colonization.

The article 7th of the colonization law of the state, of the 24th March, 1825, prohibits settlements within the twenty border and the ten coast leagues, except they be such as to meet the approbation of the supreme executive of the union. For this purpose, all future petitions on the subject, whether made by Mexicans or foreigners, shall be passed to the supreme government, accompanied with a corresponding report; and, in the 47th article of the same law, it is declared that the petitions pending upon the object for which the law provides, shall be dispatched according to the same, and, for this purpose, they shall be passed to the executive; and all families established in the state, without yet having had lands legally assigned to them, shall conform to the said law, and to what the executive of the union shall direct with respect to those who may be found *(se hallen)* within twenty leagues of the line of the United States of the North, and ten littoral leagues on the coast of the Gulf of Mexico. [Laws of C. and T. p. 22.]

This article shows that all grants of land, lying within the border leagues, depended upon the direction of the executive of the union, although the families may have been established in that territory before the passage of the law.

It is not necessary, in this opinion, to give a definite construction to the words employed in the article, exempting from the law such as have had lands legally assigned to them. It is sufficient to say, that, in this case, the lands cannot be said to have been legitimately assigned under the former government, nor were they so considered by the state executive, or, otherwise, he would not have required the grant to be issued in conformity to the laws of colonization.

In connection with the above provisions, we may refer also to the fifth article of the instructions issued by the legislature to the commissioners in September, 1827, not as affecting this title, which was previously made, but as showing the views entertained at that period, by the state as to the extent of her power over the lands lying within the border territory. This article prohibits the commissioner from giving possession to any colonist who may be established, or who may wish to establish

themselves, within twenty frontier leagues of the United States of the North, and ten littoral leagues, unless the person interested shall present him a special order from this government, wherein the approbation thereof of the national government shall be manifested. [Col. Laws of C. and T. p. 71.]

This provision accords with the articles cited from the colonization laws of the state, and, together, they furnish conclusive evidence that the legislature did not then, at least, assume the power of granting land within the territory bordering on the United States of the North, without the previous approbation of the supreme executive of the union; and that it was immaterial whether the applicant for land was a native or foreigner, or whether he had established himself within that territory before or after the passage of the colonization law.

Were the question we have been considering properly before the court on the demurrer, the judgment would be sustained, on the ground of the nullity of the title from the want of approval of the supreme executive of the union.

But, as we have already intimated that we cannot have judicial knowledge of the location of the lands being within the twenty border leagues, the subject will not be further examined.

The judgment must be reversed, and the plaintiff may, perhaps, on amendment of the pleadings, be able to show that the approbation of the federal executive had been obtained.

There were other grounds urged in support of the judgment of the court below, on none of which, however, do we consider that it can be sustained.

It was contended that the title exhibited was not admissible as evidence to support the action, on the ground that it had not been confirmed by the district court, under the act of 1841, to quiet land titles within the twenty frontier leagues, bordering on the United States of the North. [p. 177, Laws of 1841.]

The question presented in this portion of the argument is one of very grave character, but its examination, in the present case, is declined on the ground that it cannot be decided, from the fact that the location of the lands within the twenty border leagues is not judicially known to the court.

It is ordered that the judgment be reversed and the cause remanded to the district court, with leave to the parties to amend, if they see proper to do so; and to have such other proceedings as may be in conformity with law.