-Lipscomb, J.
Tiie appellant brought his suit in tiie court below to recover possession of a quarter of a league of land granted by the authorities of tiie State of Coahuila and Texas to Francisco De Leon, as one of the colonists of Martin Do Leon’s colony. It is alleged that the said Francisco is dead, and that tiie plaintiff is his father and only heir. There was a verdict for tiie defendant, and the plain-tiff appealed.
The fact of (lie death of Francisco De Leon, the grantee, and that tiie plaintiff is his only heir, is fully established by tiie evidence. The deed upon its face is in the. usual form of grants made by the commissioner for extending titles to colonists under colonization contracts. Two objections were made to tiie title going to the jury that were disposed of by us in tiie ease of Bissell v. Haynes et al., decided a few days ago. It was to tiie validity of the grant, upon tiie ground that the land granted was within, the littoral leagues, and could only he granted witli the approbation of tiie Federal Executive. Our opinion was that tiie empresario, Martin De Leon, had the approbation of the Federal Executive to his contract with the State Government, and that it embraced the littoral leagues between tiie Lavaca and tiie Gnadalonpe and Coleto, The second was to tiie action of Diácido Vcnebides, styling himself empresario ad interim, in reporting to tiie commissioner tiiat the petitioner, Francisco De Leon, posscsse-dThe requisite qualifications as a colonist. To this we answered that, as the action of the empresario was not essential to tiie validity of (lie commissioner’s title, it was not material to decide whether Vouebi'des was legally authorized to act as empresario or not.
The tille offered was the. testimonio, audits execution was, we believe, sufficiently proven by proof of the handwriting of the assisting witnesses and tiie commissioner. (See Titus v. Kimbro, Tyler, April Term, 1852, 8 Tex. R.)
Tiie objections arising from the face of tho title and from its auUieulication not being valid, the verdict of tiie jury, if sustainable, must rest upon the facts given in'evidenco. on the trial. The defense arising from tiie evidence may be considered under tiie following distinct heads:
First. That the title was void for fraud in its issuance.
*301 Second. It was issued contrary to Law in reierence to the facts, and therefore void.
Third. That the deed, as to its locality, is too vague and uncertain to admit of identifying the land conveyed, and that it was not identified.
And lastly, tiie law of limitation.
Beginning-, then, in the order in which, the several points have been arranged, wo will not stop to notice the various aud conflicting decisions on the que:-ti'/n of fraud; whether it is to he. regarded as one of law to be decided by the judge, or of fact to be found by the jury. Such an examination would he wholly'useless, as it is the settled doctrine of this court that fraud isa question of fact for the consideration aud finding of tiie jury, and it is no longer an open question.
Tiie facts appearing from the record, from which it is supposed that fraud in the commissioner in making- tiie concession must be reasonably inferred, are, that the commissioner, Fernando Do Leon, the present plaintiff, is the fattier of the grantee; that the grantee, at the date of the concession, was a minor, from fourteen to seventeen years of age; that lie uvas absent from the State of Ooalmila aud Texas, in the State of Louisiana, al school, at tiie date of the concession and tiie petition upon which it was made; that tiie petition for tiie concession as a colonist purports to have been made at Guadaloupe Victoria; that the grantee was tiie only child of the commissioner, and that the mother liad died some years before; and there ivas no evidence that tiie family of tiie commissioner was composed of any other members than the father and son ; and that the father liad received a concession of one sitio of land, as the head of a family; that there was no other instance in tiie colony of a minor c.onst.ituling- a part of his father’s family, receiving a concession of a quarter of a league of land as his headlight as a colonist, being the portion allowed by law to unmarried men who were colonists. It appears, further, from tiie evidence that at tiie time the commissioner (tiie father) came into the colony as a colonist his soil could not have been exceeding ten years of age. All of these facts must have been known to the commissioner at tiie time he was passing upon the qualifications of his son necessary to constitute him a colonist, entitled to the portion of laud ho solicited. Would not all of these facts lie sufficient to sustain the conclusion that the commissioner had been guilty of a gross fraud aud malfeasance in liis office in making the grant ?
It is, however, answered, that tiie grantor may have acted fraudulently in making the deed; yet if tiie grantee was not privy to the fraud, his right, acquired by (he grant, would uot he tainted by the fraud. This, as a legal, general proposition, may be admitted, and it is certainly true in the case of an innocent purchaser for a valuable consideration without notice of tiie fraudulent intent of his vendor. If, however, the vendor is the agent of tiie purchaser, it would he impossible for tiie principal to escape from tiie taint and the legal consequences of the fraud of his agent. We apprehend that, in a case like the present, of the father acting for an infant son in his absence, if lie should acquire property for that infant'through fraud, it would affect the title of the infant so acquired by fraud, and render tiie whole transaction a nullity, notwithstanding it was the fraud of the father only. It would be altogether different from a transfer by the father of his own property for a valuable consideration to an innocent purchaser without notice. The father, in this transaction, must he regarded as acting for tiie infant; and although lie could not hind the infant to his contract, yet it seems that when the infant seeks to derive any advantage from such assumed agency, lie would have to take it affected by all tiie vices of the contract known to liis father, who had acted as agent or trustee for him. This transaction appears more like a voluntary donation on the part of the commissioner than a sale for á valuable consideration, notwithstanding it was clothed with the formalities of a sale, The commissioner paid the fees to the surveyer for making the survey and returning the field notes. *302 Ancl the inference is not unreasonable that the infant never knew of the transaction.
And it may he doubted, even if the fraud of the commissioner conld not be set up against the infant, wheLher the commissioner could at any time claim any title in himself derived from his own fraud. The double capacities he had assumed were incompatible with each other. As a commissioner, he was defrauding- the Government; and as the father and guardian of his infant son, he procured the fraudulent concession, well knowing, both as commissioner and father, that it was a fraud.
It cannot be true that the fraud of the commissioner in this case cannot vitiate the deed, because he is the agent of the Government and the Government must submit to suffer by his delinquency; that although this same commissioner, as the father and guardian of his infant son, was not only a participator but the contrivor and executor of tine fraud, such fraud cannot invalidate the deed, because the infant was not a participator. Such a -conclusion would be as repugnant to common sense as it is to sound morality. This case would justly form an exception to the rule, if the rule was acknowledged to be that none but the injured party can take the advantage and show the nullity of the grant on the ground of fraud. There was no innocent party to the transaction, because the infaut represented by his father was no party to the contract. But we believe that if the fraud really existed in this case, it made the contract or pretended grant a nullity, and that it never for 'a moment separated the lands embraced in it from the mass of the public domain ; that it was void in its inception, and could confer no right nor interpose any obstacle to anyone claiming adversely to it; that the pretended grant being a nullity from its inception, the land that it pretends to convey was subject to location by any one holding a genuine and valid certificate. Such was the opinion of this court expressed in Mason v. Russell’s Heirs, 1 Tex. R., 730.
Brand is, however, a question of fact to be found by the jury, and the only control the court can exercise is on a motion fora new trial on the ground that the evidence of the fraud does not support the verdict of the jury. The question for our decision is, if the jury should find a verdict establishing the fraud from the facts and circumstances detailed in this case, uninfluenced by any charge, wrong in law, from the bench, could their finding- be set aside on the ground that their verdict was unsupported by evidence? It is believed that it could not without assuming- a control over the verdict of a jury that would be unauthorized by an}' well-established rule of law on the subject. It is true that there are only circumstances given in evidence, but they constitute a strong chain tending to support the conclusion of fraud; and in Thompson, administrator, v. Shannon and the administrators of Cochran, decided at the present term, we held that fraud cottld be legally inferred from proof of facts inconsistent with good faith and the fairness of the. transaction. We will hereafter consider how far the finding of the jury in this case may have been influenced by an erroneous charge of the judge upon the trial, and will proceed to the second ground proposed for our consideration, that is, the power of the father, acting as a commissioner, to grant land to his infant son as a colonist, under the circumstances of this case.
Theincompatahilityof the commissioner assuming two characters — petitioner for his son, an infant, and grantor, as commissioner, of the petition — was discussed under another branch of our opinion, that the assuming such double character was an evidence of fraud. We will now inquire if his powers as commissioner authorized him to in effect deal with himself.
Mr. Justice Story says: “It maybe correctly said with reference to ebris-“tian morality that no man can faithfully serve two masters whose infcer- “ ests are in conflict. If, then, the seller were permitted as the agent of another “to become the purchaser, his duty to his principal and his own interest would “ stand in direct opposition to each other; and thus a temptation, perhaps in “ many cases too strong for resistance by men of flexible morals or hackneyed “in the common devices of worldly business, would be held out which would *303 “betray them into gross misconduct and even into crime. It is to interpose a “preventative check against such temptations and seduction that a positive “prohibition has been found to be the sound policy encouraged by the “purest precepts of Christianity.”. (Story on Agency, sec. 210.) And again, in section 211: “ Hence it is well settled (to illustrate the general rule) that an “ agent employed to sell cannot himself become the purchaser.” This principle is believed to prevail in the civil law, from whence it was deduced and engrafted upon our system.
If tlie commissioner is to bo regarded as a mere ministerial agent of his Government to extend titles to such persons as should be adjudged by him to possess the requisite qualities as colonists, the above principles would apply, and forbid his acting upon his own claims. And that he was so dealing with himself in reality cannot be doubted, when the infancy and absence of his son, together with the fact that he paid the fees, are considered, and the further consideration, that his son was incapable, by reason of his subjection to his father, to act for himself. It will be found, by reference to the Spanish civil law, that in carrying out the same principle, and in guarding against temptation and the seductive influence of interest, partiality, or prejudice, that law is more stringent, and embraces more offices, trusts, and agencies, and extends the prohibition on account of family relations further than our own law. In Stroud’s case, 16 and 17 of Eliz., Lord Coke thought that an act of Parliament “giving to any to have cognizance of all manner of pleas within “his manor of D,” he shall hold no plea whereunto himself is a party, for inigtiium est ctliquem sua rei esse judicem; and that the exception was implied in the statute. (Lord Campbell, L. Ch. Jus., vol. 1, p. 245.) The same doctrine is found in Blackstone. And we believe that it is a principle of universal jurisprudence that no man can adjudicate his own case, nor the case of one so nearly related by blood as a son; but in this case it is clear that there was but one party to ask for the grant and to concede it, and that this double capacity of commissioner to extend title and grantee is so very incompatible that to tolerate it would be alike repugnant to sound policy and to good morals.
To the question, What would be done in a case where the son was entitled to laud as a colonist, if his father, as commissioner, was not authorized to extend titles to him ? a ready answer may be given : let him ask of the political chief or other competent authority the appointment of a special commissioner, as it is believed the commissioner had previously done, in procuring titles to the quantity of land that he himself was allowed to receive as a colonist. This case is one of such strong and peculiar features that if no principle of law could be found against it', yet it would strike the common sense of every one whose moral sense had not been weakened by interest or some other improper influence, that a deed made under such circumstances ought not, by any court, to meet with the slightest degree of favor or countenance. Wo believe, however, that it is repugnant to well-established principles of law, and that the commissioner had no authority to make it. ’
Thirdly. That the field notes of the survey are vague and uncertain, not admitting of identity as to the land conveyed by the deed or intended to be conveyed.
The description of the land given in the field notes of the surveyor, and recited in the deed of the commissioner, is as follows, i. e.: “Situated on the “western side of the Matagorda bay, commencing at a stake which was placed “at the edge of the bay, which serves as the first corner of this survey, a well, “known as John McHenry’s, being to the south, 45° west, seventy varas.” The second corner is described as “a stake planted in the prairie, which is on “a line running from the beginning, south, 45° west, 4,687 varas from the “beginning.” To this corner there are no witness or bearing points given. “ Thence north, 45° west, 2,850 varas, where a stake was driven in the prairie, “forming the third corner.” To this third corner there were no bearing or witness points given. “Thence north, 45° east, 3.GS7 varas, to the edge of the “bay, where another stake was driven for the fourth and last corner, there *304 “being a small mound to the north, 5G° west, and an island in the hay, “to llie north, 9° 45" east; thence, following- meanders of the bay, to the “beginning.”
The description of the laud is very imperfect from not giving more certain and distinct hearings to (he starting corner, and none to the others except the fourth and last, and this is defective in not giving- tire distance of the small mound, as well as its hearings. The bay shore, with its meanders, is given as the line from the last corner to the first, hut it does not appear to have been surveyed, and the courses and distances according to the meanders given. Had this been done it would have furnished some data for ascertaining the particular part of the bay on which the land claimed fronted. If, however, either the first or the last corner could be identified with certainty, it would have been sufficient, as the others could have been fixed by the courses and •distances, they having no natural boundary or bearing points. The surveyor who had first surveyed the laud and furnished the field notes set out in (lie ■deed was sworn as a witness to establish the locality of the land. lie believed ■that he had found the corners and boundaries by ascertaining the fourth and last corner and reversing his lines. There was, however, some uncertainty left as to whether he would have been able to find the coruers and bonndaries’from the deed alone. This cannot he very material. If from any source he received information as to the place of some known point described in the survey, from which he could ascertain the precise boundaries, it was sufficient, and there could he no sort of objection to his availing himself of such informal ion.
There is, however, some doubt and uncertainty in the evidence of (his witness in establishing the survey. He is not very confident in the starling point. This uncertainty results from the old well, which he at first was confident was McHenry’s well, designated in the original survey as the hearing point, but it proves to be much further from the corner on a resurvey than is given as the measured distance iii the original; thinks though it may have been a mistake in the chain carriers in the first or original survey. His opinion of the correctness, though, of the corner .established by him in the second survey is •confirmed by his recollection of a bayou near the starting corner; but the bayou is not named in the survey, aud it is somewhat singular (hat it was not, as it is likely that it would be more notorious and permanent than the well, there being a groat many wells in the immediate vicinity of McHenry’s, and they were easily made in the swash, as it is called. A few feet would he sufficient to procure water, and from this being- so shallow and in a sandy ground, they would soon be filled up and every vestige of them be lost. The distance having increased, may possibly have been produced bjr the water of the bay receding from the land. The surveyor seems to have more confidence in the accuracy of the establishment of the last or fourth eorner of his survey, bu; as to this there is some conflict between him and other witnesses (hat may have caused a doubt in-the minds of the jury, and may have induced them to believe that the snrvfey was not sufficiently identified. The admission of the defend.ant that lie believed he was living on the De Leon survey was proper evi-. donee to go to the jury. It was attempted to he proven that he never had made the admission. It was a question for the jury to decide after it was permitted by the court to go to them. In reviewing the charges of the court on the rejection and admissibility of the evidence we may take occasion to exam-ino this’part óf the evidence ottered by the defendant. Whether the survey • originally alleged to have been made was made out by the testimony was for the jury to decide, and had they decided either way in this case there would hardly have been a sufficient ground for setting aside the verdict.
AVe will proceed, in the fourth place, to inquire whether the evidence supported the prescription claimed by the defendant in favor of his right. The title and possession of the defendant, in support of which he invokes the aid of prescription, is derived from the location and survey of a land certificate bearing- date-. There was a great deal of testimony as to the character in which the defendant settled upon the land, and exceptions taken to the rul *305 ing- of tlie court as to the admissibility of some of the evidence, that would have required an elaborate investigation; but the view we have taken of the evidence will render such investigation unnecessary.
Note 103. — Bissell v. Haynes, ante, 556.
Note 106. — \Yord i\ McKinney, 25 T., 258; Andrews v. Marshall, 26 T., 212; Hatchett v. Conner, 30 T., 104.
Note 107. — Flanikin v. Fokes, 15 T., 180.
Note 108. — Peck v. Moody, 23 T., 93.
The defendant failed to show that the certificate under which ho located and claims to have entered was a genuine and valid certificate. Tins has uniformly been held by us to be indispensable for headlight certificates. Had lie sued vipon such certificate and location he would have boon required to aver that it was a genuine and valid certificate, and when sued and resting his defense upon aneh certificate lie must prove its genuineness and validity. Without such proof he was not in a situation to claim the statute of limitations as a protection to iiis possession ; and the verdict of the jury in his favor can derive no support from the length of time of his possession under his location and survey, no matter how long he had held under such location, resting his defense thereupon.
In discussing the question of fraud we promised to inquire into the correctness of the court in its ruling, to see if there had been any such error as would .probably influence the jury in their finding on the question of fraud. A witness on the part of the defendant was asked if the plaintiff was not strongly opposed to the Ilcvolntiou. The question was objected to by the plaintiff; the objection was overruled, and the witness answered that he was opposed to the Independence of Texas, or words to that effect. The same witness was asked if two men, Americans, had not been killed about that time in Victoria, and if he did not believe the plaintiff' could have prevented the killing if lie had tried to do so. This was objected to ; the, objection was overruled, and the witness said he liad heard so, and believed that plaintiff could have prevented it. This testimony was improper, inadmissible, and ought not to have been allowed, not only because it was not relevantdo any material and legal defense set up by the defendant, but was still more decidedly wrong when considered in relation to the fraud that had been charged against the plaintiff in the extension of the title under which he claimed to derive his right of action. Ho .may have been culpable in that matter, if the facts alluded to were true, of which, however, there was no evidence, the witness only swearing to wliat he had heard. But such culpability had nothing to do with the truth of the charge of fraud, and it is very obvious that it was calculated to excite the prejudices of the jury against him,, and leave to him hut little hope of an impartial trial and verdict.
Tor this error the judgment would he reversed, because it may have influenced the jury in the finding of their verdict; but as we have arrived at the •conclusion that the grant was void for want of power in the grantor, no beneficial result could be obtained by sending tiie case back, and therefore the judgment is affirmed.
Judgment affirmed.