**J. R. ABRAHAM, Appellant,**

v.

**AMOCO PRODUCTION COMPANY,**
Appellee.

**No. 5268.**

Court of Civil Appeals of Texas,
Waco.

June 28, 1973.

C. Sidney McClain, Dallas, for appellant.

Frank J. Scurlock, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is an appeal from a summary judgment. Plaintiff-Appellee Amoco Production Co. as Unit Operator brought this suit against Defendant-Appellant J. R. Abraham under a Unit Operating Agreement for operating expenses allegedly incurred by the unit which Plaintiff-Appellee Amoco alleges are due from Defendant-Appellant Abraham because of his participation with a working interest in such unit. During all times material to this suit, Amoco Production Company was operating under the name of Pan American Petroleum Corporation; therefore, we use the name "Pan American" when referring to the Plaintiff-Appellee Amoco.

Pan American sued Abraham for $29,747.10 plus interest from December 31, 1969, and costs. Plaintiff-Appellee Pan American filed a Motion for Summary Judgment based upon the pleadings, depositions, affidavits, and several written agreements. (The written agreements referred to total about 100 pages in length).

Defendant-Appellant Abraham filed his Affidavit in Opposition to the Motion for Summary Judgment, pertinent portions of which are hereinafter quoted. It should be pointed out also that Defendant Abraham had filed his First Amended Original Answer and Counterclaim; all of which included a Plea in Abatement, the four-year Statute of Limitations, fraud on the part of Pan American and its agents, novation (a new agreement having been alleged as made by the parties), laches and error in method of computing interest. In his Counterclaim, based upon actionable fraud, he sued Pan American for $21,670.27 together with exemplary damages in an amount not exceeding double the amount of his recovery under Article 4004, Vernon's Annotated Texas Statutes and Section 27.01 of the Business and Commerce Code, V.T.C.A.

The trial court, after hearing, denied and overruled all of Defendant Abraham's pleas and his Counterclaim and granted Pan American's Motion for Summary Judgment, giving Plaintiff everything it prayed for which amounted to $29,747.10 plus $5,354.46 interest to date of judgment, totalling $35,101.56 in all, with interest from the date of judgment and costs. We reverse the trial court's judgment and remand the cause to the trial court for trial on the merits.

Appellant asserts eleven points of error; however, we will discuss only four of them.

Points six and seven assert that the trial court erred in granting the summary judgment and denying the Defendant's Counterclaim because there was evidence of actionable fraud on the part of Pan American and its agents. We sustain these contentions.

Point eight contends there was evidence of an accord or novation under which Defendant Abraham was excused from all personal liability for the operating costs sued for. We sustain this contention.

Point ten says there is some evidence that the amounts claimed by Plaintiff to be due under the agreements is not correct or properly calculated. We sustain this point.

In support of Defendant-Appellant Abraham's points of six, seven, and eight (fraud and novation), we herewith quote from Abraham's Affidavit in Opposition to the Motion for Summary Judgment:

"1. By Original Petition filed June 3, 1970, AMOCO PRODUCTION COMPANY (under its prior name of Pan American Petroleum Corporation and hereinafter sometimes referred to as 'Plaintiff', 'Amoco' or 'Pan American') is attempting to assert a cause of action based upon certain Agreements entered into between the parties hereto and which Agreements are styled as follows: Ratification and Joinder of Unit Agreement and Unit Operating Agreement Northeast Hogback Unit, San Juan County, New Mexico, signed by myself on June 20, 1961; Agreement for Commitment of Working Interest to Unit Agreement and Unit Operating Agreement Northeast Hogback Unit, San Juan County, New Mexico, signed by myself on June 20, 1961; and Letter Agreement dated June 15, 1961.

The circumstances surrounding my participation in the above-mentioned Agreements are as follows:

Prior to June 20, 1961, I owned Federal Oil and Gas Leases located in San Juan County, New Mexico, covering 160 acres of land. I had four wells on these properties and a tank battery for each well, plus a line from each well to the pipeline. There were pumping units on the wells and the wells were producing favorably. These wells represented an investment of approximately $200,000.00. These leases were productive in the Gallup producing formation or horizon.

About six weeks prior to June 15, 1961, I was approached by a land man representing Pan American named Hiltz, who started trying to influence me to join and participate in a Unit which had been established to handle and regulate production near my leases from the Gallup pay zone.

This Unit was called the 'Northeast Hogback Unit' ('Unit'). My first response and answer to his suggestion and attempt was a flat 'No'. Hiltz was not satisfied with my rejection of his proposal, and continued to urge that I should agree to join the Unit. As an answer to his request for reasons why I did not want to join the unit, I gave him several reasons including the fact that Pan American had a bad reputation for being an expensive operator—more expensive than any other operator—which often operated all of the profit out of a good productive unit, and left the owners with operating expenses that they owed beyond and above the benefits they received from production. I also told him that I owed a considerable debt of approximately $157,000.00 to the First National Bank in Dallas, Texas ('Bank'), and that I needed the money from my production from these San Juan County Federal Leases to pay my obligations to such Bank.

Hiltz then told me that, if I would agree to join and participate in such Unit, I would never be personally responsible for operating expenses involved in the Unit operations, and that my bank loan to the said Bank would also be paid out of the proceeds of production attributable to my interest in the said Unit. Hiltz further said and represented that Pan American knew what it was doing, that the Unit would make a lot of money, and that I would make more money by joining the Unit than I would make from my leases if I did not join the Unit. It is important that, the months immediately before I joined the Unit, my income from my said leases was more than adequate to allow me to retire the indebtedness at a reasonable rate, pay the operating expenses of the four wells on these Federal Oil and Gas Leases and to realize an additional margin of profit each month from these wells. At this time my operation costs for these four wells and two other wells which were in the area not under these leases totaled $400.00 per month. For the five months

immediately preceding my entry into the Unit my income from said four wells (which were later included in the Unit) was by month, respectively, as follows:

| Month | Gross After Royalty | Taxes | Net Before Operating Costs |
|---|---|---|---|
| January, 1961 | $17,591.15 | $1,118.28 | $16,473.23 |
| February, 1961 | 14,906.89 | 923.25 | 13,983.64 |
| March, 1961 | 14,875.05 | 888.37 | 13,986.68 |
| April, 1961 | 14,298.64 | 864.85 | 13,433.79 |
| May, 1961 | 13,230.70 | 810.94 | 12,419.76 |

Although I would never have consented to join and participate in the Unit unless I had been promised that I would never have any personal liability for operating costs in connection with the Unit, upon receiving such promise and the promise that the said Bank loan would be paid out of the proceeds of production and that after it was paid I would thereafter get at least 25% of my interest, I did consent to contribute my leasehold interest in the said Federal Leases and the four wells on the acreage covered by such leases into the Unit.

At that point Mr. Hiltz was about to terminate his employment with Pan American and I was placed in contact with Mr. Harry Hickman and a Mr. J. W. Austin to reduce the agreement to writing. The meaningful result to me of the agreements which were entered into was the letter of June 15, 1961,* a copy of which is attached as Exhibit 'C' to Plaintiff's First Amended Original Petition filed in this cause and which letter is incorporated in full in this Affidavit by this reference for all purposes, as I was under the impression that the substance of the letter provided me with full protection against personal liability for operating costs from the Unit. In this connection I would state that what the Plaintiff now says about the distinction between general operating costs and a term which they defined in the Contract 'secondary recovery expenditures' was not made known to me at the time I signed the Agreement and it is my position that this distinction was purposely and fraudulently concealed from me by Pan American at the time I signed the said June 15, 1961 letter in spite of the fact that the four-page letter was made available to me at that time; and I was of the impression and of the understanding that the provisions of paragraph '7' of the letter protected me fully against personal liability as I was not made mindful of a distinction between, and I was not mindful of the distinction between, the defined secondary recovery expenditures and the operating costs generally as I thought in a Unit all of the operating costs were properly to be considered secondary recovery expenditures or costs. In further explanation of the situation and the fact that I was susceptible to a fraudulent misrepresentation by Pan American agents and employees in obtaining my signature to the letter I would call attention to the fact that for many years I have been suffering from a malady which has affected my vision and which is commonly referred to as 'tunnel vision'; and this problem has rendered me virtually blind. Also, although I had an interest in these leases I was not a person who had any considerable degree of familiarity with the oil business even though I owned the above-indicated interests at the time and had some other interests resulting from my association with my brother, Mike Abraham. At the time I signed the letter my vision was limited so that it was possible only to discern with difficulty one word at a time on any printed or written

---

* Paragraph 7 of the letter agreement between the parties dated June 15, 1961 contains the following language:

"7. Abraham shall never be personally liable to repay to Pan American any of the Secondary Recovery Expenditures ————."

matter I was attempting to read; and I was of the impression and of the understanding that the said paragraph number '7' in said letter had been placed in the letter in response to my insistence and our agreement that I was not to have any personal liability at any time for operating costs of the Unit. The actions, intimations and inferences of the employees and representatives of Pan American were such that I was led by them to believe, and was led to the conclusion, that such paragraph gave me the protection which I demanded.

It now appears that I was mislead to my detriment by Mr. Hiltz primarily and by the representations that I would never be personally liable for such operating costs.

I was never approached to pay any operating expenses personally, and never had any thought that I would ever be requested to contribute anything to the operating costs of the Unit above the proceeds which were attributable to my interests in the said Unit until rather late in the year 1965.

During the period of time from my entry into the Unit until toward the end of May or June, 1965, it is my understanding that all of the proceeds to which I was entitled from production from the Unit were paid to the said Bank to be applied on the payment of my bank loan and on the share of the operating expenses which was to be borne by my interest.

When the loan had been reduced to approximately $6,500.00 by the application of proceeds from production, I proceeded to pay the balance of this loan with funds which I then had available. Following the time of such payment, I then started to receive 25% of 82½% of my interest in the Unit for a period of several months.

2. Shortly after December 14, 1965, I received a letter bearing such date from a Mr. C. S. Weaver, an employee of Pan American, in which I was advised that there was a delinquency in payments on my behalf to Pan American for operating costs under this Unit. Mr. Leo Hoffman, an attorney in Dallas, Texas, contacted Mr. Baker, an employee of Pan American, on my behalf and there was an understanding between the parties that I would return the amount which I had received in December for production attributable to 25% of 82½% of my interest in the property and that I would allow and authorize Pan American to receive for application against operating costs chargeable to my interest in the Unit all of my said interest (including the said 25% of 82% which I had theretofore been receiving for several months) with the understanding that I would have no personal liability for any of such operating costs either past or in the future. Mr. Hoffman wrote a letter to Pan American over my signature dated January 17, 1966 (although the year was incorrectly stated in the letter as '1965') in which he authorized in writing Pan American to start collecting said 25% of 82½% of my interest for application on the operating costs with the further statement that:

'It is my understanding that while you currently retain the above mentioned 25% of 82½% of allocated unitized substances, I will not be liable to you for any excess of development and operating costs and expenses over the proceeds of such retained production.'

A copy of such letter is attached to this Affidavit as Exhibit 'A' and made a part hereof by this reference for all purposes.

3. I was confronted with no further effort on the part of Pan American to collect any amount for monthly charges for operating expenses on this Unit until August 26, 1969. At that time C. S. Weaver wrote me a letter requesting a check for the amount of $29,197.75 which was stated to be due as of July 31, 1969.

Between the time that I had Mr. Leo Hoffman write to Pan American in January of 1966, until the August 26, 1969 letter was received from Pan American, my alleged liability increased according to the letters from Pan American from about

$6,000.00 to $29,197.75. Throughout this entire period I had been led to believe, and our agreement was, that I would have no personal liability for operating costs from this Unit. During such period and from early in the year 1966 through the date of this Affidavit I have received no more income attributable to my interest in the Unit. During the same period I was not placed on notice of my need to protect myself against the great amount of additional liabilities that Pan American now claims I owe it as a result of the extremely high operating costs involved in the Unit. Had I had any indication that an attempt would be made to hold me personally liable for these amounts which Pan American has now attempted to accrue against me and to hold me personally responsible for, I could have taken steps to bring into contest and controversy the operations of Pan American and to challenge their operations of the Unit properties and could have withdrawn my properties from the Unit. The delay also tended to make more difficult proof of Pan American's extravagances and unnecessarily expensive handlings of the operations matters which I would have relied upon to attempt to defeat Pan American's claim at the time had I known that an effort would be made to hold me liable personally for such expenditures. It is my position at this time that, under the above and all of the other circumstances which relate to the respective positions of the parties, that the demand of Plaintiff is stale and that for this further reason there should be no liability placed upon me personally for the operating charges for the unit.

4. It is further my position that based on these negotiations in late 1965 and early 1966, that a new agreement between Pan American and me was entered into; and that, irrespective of the legal result to be attributed to my June, 1961, agreements with Pan American, this 1966 agreement placed me in a position so that I was not to be held personally liable for any operating costs during any period of time that I was a member of the Unit.

Part of the consideration for this Agreement was my agreement to relinquish my right to receive direct from Pan American 25% of 82½% of my interest in the Unit and instead to have that said interest retained by Plaintiff to apply against the operating costs. Under this agreement I returned to Plaintiff the sum of $699.44 which I had received for the December production runs attributable to 25% of 82½% of my interest in said Unit which Pan American sent to me following our agreement and which in my opinion was properly to be returned to it in keeping with the spirit of our agreement."

With reference to Appellant's point ten, to the effect that the amounts sued for by Pan American were incorrect and not properly calculated:

(1.) In the Deposition of Glen E. Irwin, a senior accountant employed by Pan American for 23 years, upon whom Plaintiff depended to verify the amounts sued for, Irwin admitted that there could be mistakes in the items sued for, in view of the largeness of the scope of operations of Pan American and the number of people's hands that information and data had to go through, from the original sources of the expenses (in New Mexico) to the final postings in the accounting offices (in Tulsa, Oklahoma). Irwin also testified that he could not verify the correctness of all the items sued for.

(2.) Irwin also admitted in his deposition that Defendant Abraham had erroneously been charged a $257.00 item and a 99¢ item which was part of the amount sued for, which had already been paid Pan American by Abraham through their recovery of secondary recovery expenses.

(3.) The agreements under which Pan American sued provides that amounts not paid when due will "bear interest at the rate of 6% per annum until paid." Irwin

stated in his deposition that Defendant Abraham was charged interest at the rate of ½% per month. When asked if there could be a difference in computing the interest at 6% annually as compared to ½% per month, Mr. Irwin answered, "I cannot say."

Our Supreme Court has interpreted Rule 166–A, Rules of Civil Procedure, regarding summary judgments, in Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company (Tex.Sup. Ct.1965) 391 S.W.2d 41 and in Gibbs v. General Motors Corporation (Tex.Sup.Ct. 1970) 450 S.W.2d 827, and we will not repeat those interpretations here.

Fraud vitiates every transaction tainted by it, and the existence of fraud is a question of fact for the trier of facts. Drinkard v. Ingram (Tex.Sup.Ct.) 21 Tex. 650; Graham v. Roder (Tex.Sup.Ct.) 5 Tex. 141; DeLeon v. White (Tex.Sup.Ct.) 9 Tex. 598; 26 Tex.Jur.2d, par. 140, p. 126.

The following cases from this court affirm the foregoing, and further hold that in cases in which summary judgment has been granted, if the affidavits or other summary judgment evidence raise a fact issue as to fraud, then summary judgment is improper. Farnsworth v. Dolch (Waco Civ.App.1972) 488 S.W.2d 531, error refused NRE; Young v. Texas Employers Insurance Assn. (Waco Civ.App.1972) 488 S.W.2d 551, no writ history; Dudley v. Lawler (Waco Civ.App.1971) 468 S.W.2d 160, no writ history; and Crow v. Crow (Waco Civ.App.1972) 485 S.W.2d 928, no writ history.

Likewise, material fact issues are raised by Abraham's affidavit as well as elsewhere in the record concerning the accord or novation question; that is to say, whether the parties entered into a new agreement in January 1966 which would have relieved Abraham from any personal liability.

Also, the errors admitted by the senior accountant Irwin in his deposition concerning the computation of the amounts sued for as well as the interest charged, raise further material fact issues which render a summary judgment improper.

Appellant has other points attacking the summary judgment; however, we do not deem it necessary to discuss them. This is not a proper case for summary judgment. We therefore reverse the trial court's judgment and remand the cause for trial on the merits.

Reversed and remanded.