**HARRIS et al. v. O'CONNOR et al.**

No. 4355.

Court of Civil Appeals of Texas. El Paso.
Nov. 2, 1944.

Rehearing Denied Dec. 7, 1944.

Second Rehearing Denied Dec. 28, 1944.

Gerald C. Mann, Atty. Gen., and Ocie Speer, Geo. W. Barcus, and Fagan Dickson, Asst. Attys. Gen. (Cecil C. Rotsch, former Asst. Atty. Gen., of counsel), for the State, appellant.

J. B. Lewright, of San Antonio, K. D. Hall, of Refugio, and Kemp, Lewright, Dyer, Wilson & Sorrell, of Corpus Christi, for Harris, Hornburg & Devine, appellant.

Hobart Huson, of Refugio, Clayton L. Orn, of Houston, Phillips, Trammell, Estes & Edwards, of Fort Worth, Burges, Burges, Scott, Rasberry & Hulse, of El Paso, Davenport & Ransome, of Brownsville, and Crain, Vandenberge & Stofer, J. V. Vandenberge, and Frank H. Crain, all of Victoria, for appellees, Thomas O'Connor, L. A. Nordan, and others.

B. D. Tarlton, of Corpus Christi, J. W. Ragsdale, of Victoria, Armond Schwartz, of Hallettsville, Rex G. Baker, Ralph B. Lee, R. E. Seagler, W. J. Howard, Harry Holmes, Jr., J. E. Price, Chas. W. Bell, and Fulbright, Crooker, Freeman & Bates, all of Houston, for appellees, Humble Oil & Refining Co., Quintana Petroleum Co., and others.

PRICE, Chief Justice.

This is an appeal by the State of Texas, Robert G. Harris, B. H. Hornburg and Thomas Devine from an adverse judgment of the District Court of Refugio County in favor of Thomas O'Connor and others. Harris, Hornburg and Devine instituted a suit under the provisions of H. B. No. 9, Chapter 3, page 465, General Laws, 46th Legislature, 1939, Vernon's Ann.Civ. St. arts. 5421c, § 6 et seq., 5421c—1 et seq. against Thomas O'Connor, certain parties claiming under O'Connor, and the State of Texas, by joining the Attorney General as a party defendant, each of the plaintiffs claiming a preference right to lease from the State for oil and gas a described area in Refugio County. Plaintiffs each filed separate suits originally, but the three were consolidated.

It appears from the pleading of each plaintiff and the intervention of the State that the Land Commissioner had refused the respective applications of the plaintiffs. Right to the leases was based on the ground that the areas described in the applications were a part of the public domain of the State, and the Land Commissioner was under the duty to have granted each application.

The State filed a petition of intervention asserting title to the land subject to the rights acquired by said Harris, Hornburg and Devine by virtue of their applications. A judgment was sought by the State for a vast sum, representing the value of oil allegedly produced by defendants from the premises in controversy.

O'Connor and those claiming under him pleaded not guilty and various special defenses.

At the close of the evidence the trial court instructed a verdict against the State and plaintiffs.

Hereinafter, for convenience, plaintiffs Harris, Hornburg and Devine will be referred to as "plaintiffs," except where named; the State by name, and defendants O'Connor and those claiming rights under him as "defendants," except where specifically named.

The three tracts respectively claimed by plaintiffs are situated in Refugio County in and a part of an area bounded on the north by the south line of what is known as the "Swisher Surveys"; on the south by the shore line of Copano Bay; on the West by Melon Creek and bodies of water into which that stream flows; on the east by Alamito or Copano Creek.

For the present purpose of showing the

exterior boundaries of this larger area and the land in dispute, we here reproduce a copy of a map appearing on page 12a of the brief of plaintiffs. It is not meant to in any way intimate that either the plaintiffs or the State assent to the proposition that the tracts shown other than the Swisher Surveys can or should be laid on the ground as thereon illustrated. In truth and in fact a conflict is shown between the three areas shown as the Hewetson, Sr., Hewetson, Jr., James Power & Son and the area shown in red,[1] which represents the three respective areas claimed by plaintiffs. That portion of the area marked in red[1] and designated by the letter "A" shows the land sought by plaintiff Hornburg; that covered by the Devine application is designated "B"; and the Harris application being marked "C".

[1] Shown as shaded area on plat.

Plaintiffs and the State claimed the land as unappropriated public domain of the State. The claim of plaintiffs, of course, depends on the validity of the State's title. The theory of the State is that it acquired the title held by the Republic of Texas, and that the Republic acquired the title of the State of Coahuila and Texas by conquest; that is, that the Republic of Texas succeeded to any title of Coahuila and Texas, and that the Republic owned the land in a proprietary capacity and said title devolved upon the State of Texas.

Defendants claim title from Coahuila and Texas by virtue of a headright grant made to James Power & Son October 20, 1834, with which they connected themselves, and another known as James Hewetson, Sr. and James Hewetson, Jr., made November 19, 1834, with which they connected themselves. In short, defendants do not claim under the State of Texas, but under grant by the State of Coahuila and Texas, when that State was part of the Republic of Mexico.

Neither the State nor plaintiffs take the position that if the purported grants under which defendants claim were valid under the laws of the State of Coahuila and Texas at the time same were made and cover the area in question here, that they are not valid today.

■■ Assent is given by all parties to the well-established legal proposition that a government succeeding to the territory of a preceding government takes in a proprietary capacity only those lands which the superseded government held in a proprietary capacity. In short, that a succeeding government is bound by the valid grants of its predecessor—this by law which each civilized nation of the world recognizes. Insofar as private titles are concerned, the succeeding sovereign is bound to recognize, protect and uphold the lawful act of its predecessor. The determination as to the validity and extent of the grants depends upon the law of the preceding superseded sovereignty. Stated in another way, the law of Coahuila and Texas of the date these grants were made is the law of Texas today in determining their validity and extent. Watrous' Heirs v. McGrew, 16 Tex. 506; Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451; State v. Sun Oil Co., Tex.Civ.App., 114 S.W.2d 936 writ refused; McMullen v. Hodge, 5 Tex. 34.

The Supreme Court of the Republic and of the State have by a long line of decisions recognized, insofar as individuals are concerned, that the succeeding sovereign should respect the grants of its predecessor.

There is substantial disagreement between the adverse parties as to where the burden of proof lies herein. Plaintiffs and the State assert that the burden was upon defendants to show the validity of their grants and that the lands for which plaintiffs sue were included therein. This is claimed to be true on the ground that the State sues as a sovereign and in the interest of the people of the State.

A rather unusual situation is presented here: Plaintiffs and defendants claim under a common source; that is, the State of Coahuila and Texas. Defendants claim that the State acquired no rights by succession for the reason that prior to the succession Coahuila and Texas had parted with title by grant to the predecessors in title of defendants. Another situation is presented, giving rise to some difficulty: The Commissioner of the General Land Office has refused to award this land to plaintiffs. Such officer is charged with the sale and administration of the public lands of the State. Under the Constitution and laws of the State it is his duty to determine whether these lands are public lands, subject to sale. His decision was that the lands involved herein were not such—not such because, as a matter of law, they were titled lands. If his decision be correct, they are titled lands through the grants relied upon by defendants. The Attorney General, on the other hand, with the power and duty of representing the State in this litigation, asserts the area is public domain.

Had the Commissioner granted the application of plaintiffs, it would have formerly created a prima facie presumption that same were public lands. It was so held by the Supreme Court in the case of Short et al. v. W. T. Carter & Bro. et al., 133 Tex. 202, 126 S.W.2d 953, in the Court of Civil Appeals, Sessums et al. v. W. T. Carter & Brother, 121 S.W.2d 486. This was the law until it was changed by the provision of H. B. No. 9, Chapter 3, p. 465, of the General Laws, 46th Legislature, 1939. That law may only deal with the prima facie effect of the granting of an application by the Commissioner. The applicable provision is as follows:

"Provided that no such award shall be made by the Commissioner except after a hearing, and provided further that no presumption shall obtain in any suit involving the existence of a vacancy, as a result of the action of the Commissioner in this respect." Vernon's Ann.Civ.St. art. 5421c, § 6(e).

An unmistakable intention is evidenced to do away with the prima facie effect of an award by the Commissioner. The language may be broad enough to apply likewise to the refusal of an application.

It would seem to be logical and reasonable that if the granting of an application in the absence of the statute creates a prima facie presumption that it is public land, that the refusal of an application should create a prima facie presumption that the area in question is not public land. The very law under which plaintiffs were permitted to in effect sue the State gives them redress for the action of the Land Commissioner. The Land Commissioner in refusing these applications was acting well within the scope of the authority delegated by the Constitution and the statutes. Here the Attorney General and counsel for the plaintiffs take the position that the action of the Land Commissioner is to be presumed invalid. This is not intended to be construed as any possible reflection on the Attorney General, or, for that matter, of counsel for the plaintiffs. The Attorney General did not originate this litigation. Being made a party, he conceived it to be his duty to urge every possible right of the State as to these lands. He could not well take any other position. The Land Commissioner appears to have acted with fairness and impartiality. Under the provisions of H.B. No. 9, Chapter 3, page 465, General Laws, 46th Legislature, he appointed Surveyor Dellis to make a survey. A careful and painstaking survey was made by that surveyor, in the making of which the adverse parties were invited to participate. His action was consistent with the action of every Land Commissioner under the Republic and the State. At no time, so far as this record shows, has either the Republic or its successor, the State of Texas, made grants in the area shown as the disputed portions of the Hewetson and Power headrights on the sketch reproduced, with the exception of one or two which were later lifted on account of conflict. The first claim ever asserted by any attorney general of the State of Texas to this area was by the intervention filed on her behalf in 1942 by the Attorney General in this proceeding.

The State at all times voluntarily appears before her courts. If she elects to so appear, there are no special privileges to be accorded by the courts. To accord the State any such special privileges would defeat the purpose of the appearance. The government is bound by law just as the citizen. The idea sought to be conveyed is well expressed in the opinion of Judge Neill in the case of State v. Patterson, 14 Tex. Civ.App. 465, 37 S.W. 478, 479:

"For courts to recognize her in any other attitude, or draw a distinction in her favor against the humblest individual who appears before them, would be to stultify themselves, and subject their judges to the condemnation of the laws of the state in whose interest they sought to violate them."

In this connection, see also State v. Cloudt, Tex.Civ.App., 84 S.W. 415, writ denied, cited with approval in Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, loc. cit. 1145.

There is a distinction between the State of Texas when considered as a sovereign and when considered as a government. When considered as a government, some of the powers of a sovereign are withheld by the Constitution. Full sovereignty under the Constitution resides only in the people of Texas. The legal organization thereof is provided for in the provision of the Constitution for the amendment thereof. Sovereign power is unlimited, irresponsible power. The people of Texas have not endowed either the executive, legislative or judicial officers of the State with the function of exercising the full powers of a sovereign. Should they ever do so, it would mean the death of liberty. The sum total of the powers of the legislative, executive and judicial officers of the State exercised under the Constitution do not amount to sovereignty. True it is, the government of the State of Texas is a governmental corporation. Some laws binding on others do not apply to the State; for instance, limitation laws. But where power is delegated to a functionary to determine facts and take action thereon, and such officer in good faith determines issuable facts and acts thereon, the State is bound. When as a

governmental corporation she appears in her courts, the applicable law is binding.

However, the question of determination of upon whom rests the burden of proof in this proceeding is not decisive of this case. The disposition thereof does not depend upon the determination of that question. As has been said, the validity of these grants must be determined by the law of Coahuila and Texas of the date same were made.

On the 11th day of June, 1828, James Power and James Hewetson, Mexican citizens, entered into a contract with the State of Coahuila and Texas for the colonization of a certain relatively large area of land, of which the area in controversy constituted a very small portion. In this contract Power and Hewetson are referred to as Empresarios. The area covered by the contract was within the littoral leagues and to be valid was required to receive the approbation of the Supreme Government; that is, the government of the Republic of Mexico. Article I of the contract refers to the approbation of the Supreme Government and states that the Government admits the project so far as conformable to the law of 1824. This contract is set forth in full in the case of Welder v. Lambert, 91 Tex. 510, 44 S.W. 281. For the specific terms thereof reference is made to .the opinion in that case. In general, it provided that Power and Hewetson should secure the settlement of immigrants of the Irish race of the Catholic religion within the defined area. These persons were to become settlers, and after a certain time the State would issue to them titles to specified areas of land within the larger area described in the contract. The larger area is generally referred to as the empresa. These titles were to be extended by a Commissioner. The compensation of the Empresarios was to be a certain quantity of what were denominated as "Premium Lands." The amount of premium lands depended upon the number of settlers secured by the Empresarios in pursuance of the contract. The legal basis for this contract appears in the 1825 Colonization Law of the State of Coahuila and Texas. See 1 Gammel's Laws, 15. It would unduly burden this opinion to set forth the provisions of this law in full.

Article 11 thereof is as follows:

"A square of land measuring one league, consisting of five thousand varas on each side, or what is the same thing, a superfices containing twenty-five million varas, shall be called a sitio, and this shall be the unit for enumerating one, two or more sitios, in the same manner as one million square varas, or one thousand square varas on each side, which shall constitute a labor, shall be the unit for counting one, two or more labors. The vara for this measure shall consist of three geometrical feet."

Article 14, as follows:

"One labor shall be granted to each family included in the contract, whose only occupation is the cultivation of the soil; and should the same also raise stock, grazing land shall be added to complete a sitio; and should the raising of stock be the exclusive occupation, the family shall receive a superfices of twenty-four million square varas, (being a sitio lacking one labor.)"

Along these same general lines thirteen of these contracts were entered into. Many of the titles recognized today as valid in the State were granted under these empresario contracts.

A study of the origin of that law, the wise public policy evidenced thereby, its administration, its historical effect, are tempting fields of comment and speculation, but aside from the issues of this case. No question is raised as to the validity of the empresario contract with Power and Hewetson. Many titles issued in pursuance thereof have been held valid by the Supreme Court of the State. In pursuance of this contract Power and Hewetson did procure Irish families to immigrate to the colony. Jose Jesus de Vidaurri was appointed Commissioner to extend titles to such settlers. On his staff he had certain surveyors, among others, Vor Loupy. On October 20, 1834, in pursuance of an application theretofore made by James Power, one of the empresarios, on his own behalf and that of his minor son, a title was issued. On the 19th day of November, in pursuance of an application theretofore made by James Hewetson, the other empresario, a grant was purported to have been made to him.

A reference to the plat heretofore reproduced will show that most of the lands sought to be purchased by plaintiffs are included in what is shown on the plat as the "Hewetson Headright," a small portion which one of the plaintiffs sought to purchase is on the Power headright as shown.

The written evidences of these acts in law, or attempted acts in law, of the State of Coahuila and Texas are on file in the General Land Office of the State of Texas. Same were so filed in 1840 in pursuance of the law of the Republic of Texas. We do not mean to say that same are all the written evidences of the grant ever in existence, but these were introduced in evidence by defendants in support of their titles. These two grants are of such vital importance in the determination of the issues in this case it is deemed necessary to set same forth in full:

"Third Seal For the Biennium
 (seal)
"Two Reals 1832 and 1833

"Lord Commissioner:

"I, Citizen Santiago (James) Power, a native of Ireland and a Mexican by law, as a settler, before you in the best form of law, declare: Whereas a league and a quarter of land corresponds to me, as being married to a Mexican woman, (I have chosen it next to the common tract of this town on the lower east side: Therefore, I beg and entreat you to please order that I be given possession thereof, such being the justice that I implore, I swear, etc.

"Refugio, Sept. 29, 1834,
"Santiago Power (rubic)

"Furthermore: I declare: please adjudicate to me the quarter league corresponding to my son Santiago as a single man ut supra.

"Refugio, October 20, 1834

"Whereas this party is indeed, not only empresario of the Colony, but at the same time a settler with a numerous family and considerable property, let him be issued the league and a quarter corresponding to him as being married with a Mexican woman and a quarter more that he requests for his single son of the same name, whom he represents. Thus I provided, ordered, and signed with those of my attendance, whereto I attest.

"Jose Jesus
 "De Vidaurri (rubic)
"Attending Witness: Attending witness:
"Vor. Loupy (rubic) Juan Dunn (rubic)

"Forthwith, I, the undersigned Commissioner, in compliance with the foregoing order, adjudicated in due form to Citizen Santiago Power and his single son of the same surname and first name the

league and a half of land corresponding to him, which according to the survey made by one of the surveyors appointed is comprised of 9.138 varas front on the creek named Alamito or Copano, and a depth on both sides of 10,560 varas. On the north-Northwest it adjoins land of Citizen Santiago Hewetson, on the West-Southwest land of same empresarios, on the South-Southeast likewise, and on the East-Northeast said creek. In virtue thereof, exercising my powers and in the name of the Supreme Authorities of the Mexican Nation and of the State, I put the interested party in quiet and peaceful possession of the aforesaid league and a half of land aforesaid (sic), which he took for himself and as attorney for his son, without any contradiction whatsoever, it being understood to him that within a year he shall construct fixed landmarks, observing otherwise that which is prescribed by the laws on the matter; in witness whereof he signed hereto with me and those of my attendance, whereto I attest.

"Santiago Power (rubic)
"Jose Jesus
"De Vidaurri (rubic)
"Attending Witness: Attending Witness:
"Vor. Loupy (rubic) Juan Dunn (rubic)

"Note: Today this petition was added to the Record Book to which it corresponds on one page, whereunto I set my scroll in evidence. (rubic of Jose Jesus de Vidaurri).
"Jose Jesus Santiago Power (rubic)
"De Vidaurri (rubic)
"Attending Witness: Attending Witness:
"Vor. Loupy (rubic) Juan Dunn (rubic)

"Note: Today this petition was added to the Record Book to which it corresponds on one page, whereunto I set my scroll in evidence. (rubic of Jose Jesus de Vidaurri)."

"Lord Commissioner:

"I Citizen Santiago (James) Hewetson, a native of Ireland, and a Mexican by law, before you in the best form of law, declare: That for two years I have been married to a Mexican woman, and whereas I have the intention of establishing a ranch for large and small stock, I have chosen a league and a quarter of land, situated between the Empresarios' league on the Copano and adjoining land of the son of Citizen Santiago Hearn, I beg and entreat you to be pleased to order that I be given that which corresponds to me as a

married man, and such being the justice that I implore, I swear, etc.

"Refugio, October 20, 1834
"Santiago Hewetson (rubic)

"Refugio, Nov. 19, 1834.

"Whereas this party is indeed, not only empresario, but at the same time a settler of the Colony with family and property, let him be adjudicated the league and a quarter corresponding to him as being married to a Mexican woman. Thus I provided, ordered, and signed with those of my attendance, whereto I attest.

"Jose Jesus de Vidaurri (rubic)

"Attending Witness: Attending Witness:
"Vor. Loupy (rubic) Juan Dunn (rubic)

"Forthwith, I, the undersigned Commissioner, by virtue of the foregoing act, adjudicated in legal form to Citizen Santiago Hewetson as a settler the league and a quarter of grazing land including a labor of farming land that he has requested, which according to the surveys made by one of the surveyors appointed, the league is composed of 2,640 Mexican varas front on Melon Creek, and a depth of ten thousand 560 varas. On the North-Northwest it adjoins vacant land, on the West-Southwest said creek, on the South-Southeast land of same grantee, and on the East-Northeast Copano Creek. The quarter league has a front of 1,149 Mexican varas on this said creek and a depth of 10,560 varas. On the North-Northwest it adjoins land of the same party, on the West-Southwest that of both empresarios, on the South-Southeast Power's land, and on the East-Northeast aforesaid Melon Creek. In virtue thereof, exercising my powers and in the name of the Supreme Authorities of the Mexican Nation and of the State, I put the interested party in quiet and peaceful possession of the aforesaid league and a quarter of grazing land, which his partner Power took in his name without any contradiction whatsoever, and having been advised of the obligations that his constituent contracts, he signed with me and those of my attendance, whereto I attest.

"Jose Jesus de Vidaurri (rubic)
"Santiago Power (rubic)
"Attending witness: Attending Witness:
"Vor. Loupy (rubic) Juan Dunn (rubic)

"Note: Today this petition was added to the corresponding Record Book on one used page, whereunto I set my scroll as evidence. (rubic of Jose Jesus de Vidaurri)."

There are two translations of the instruments in the Power grant. In the one not reproduced, the depth of the tract is stated as "a depth on one side and the other of 10,560 varas." It is not thought that this variation has any material bearing here.

These two grants are asserted void on their face. The attack is based on two grounds: (1) It was a violation of the law for Commissioner Vidaurri to extend a headright grant to an empresario of the colony; (2) that no definite area is designated and described in either grant. In short, the description is insufficient, even if aided by parol testimony.

The first contention will be first discussed.

Most certainly it appears in the face of each grant that the grantee was one of the empresarios. The law of Coahuila and Texas in force at this time neither forbade nor expressly authorized the grant of a headright to an empresario. It does authorize a grant to Mexican citizens, providing in substance that a foreigner, having become a citizen by law, married to a Mexican woman, a native citizen, received an augmentation of land. The law does authorize grants to Mexican citizens.

A perusal of the 1825 Colonization Law of Coahuila and Texas would seem to indicate the purpose thereof was to secure loyal citizens to bind them to the country by self-interest. The land to be settled was an area deemed vital to the defense of the country. If the country were attacked by foes coming from overseas, the citizen would fight for his own home as well as to protect his country.

The exact question raised by plaintiffs and the State seems never to have been authoritatively passed upon in this State. In case of an attempted grant by a Commissioner to his son, same was held void. De Leon v. White, 9 Tex. 598.

The question was raised in the case of Robertson's Adm'r v. Teal's Heirs, 9 Tex. 344. In regard to same, in the course of the opinion, Chief Judge Hemphill said:

"The appellees have rested their rights principally on the ground that an Empresario had no right to a grant of land as a colonist within the limits of his own colony. We do not deem it necessary to decide on this point. The right is not free from doubt; but one thing is certain, that

if such a grant be supported at all, it must not be justly chargeable with the sacrifice of the legal or equitable rights of third parties. It must have been obtained partly through the official instrumentality of the Empresario himself, and must not be vitiated by the infliction of wrong."

The empresarios made recommendation as to the suitability of the applicant for a grant. In short, they tendered him to the Commissioner as a fulfillment of their contract. Here the evidence fails to show any injustice perpetrated on any other colonist. Colonists of high character appear to have been sought. There can be little question but that both Power and Hewetson measured up to this standard. Historical references made in the brief showed them to be men of considerable education, of high character. When the Revolution came on, Power seems to have fought unsuccessfully to prevent these lands falling into the hands of the Mexican Government. The lands and settlements were subject to the ravages of war and it is reasonable to suppose that many of the public records of the overthrown government were lost or destroyed in the disorders arising in a way of the character of that waged by the Texans against the Republic of Mexico. Hewetson was a doctor.

It was by no means sure that Power and Hewetson could carry out their contract, considering what they were to do, persuade citizens of a foreign land to adjure their allegiance thereto, make a long and perilous sea voyage, then subject themselves to the dangers of a new and unsettled country. Viewed retrospectively, it was a bold enterprise, attended with great danger and expense. Citizens were wanted by the State of Coahuila and Texas. In the light of the policy and purpose of the law, it is hard to conceive of why, if Hewetson and Power were willing to throw in their lot with the colony they were seeking to found, that they should not receive the lands appertaining to a colonist. It does not appear that their taking the land would harm the rights of any other colonist. There was an abundance of land, a shortage of families. In no way does it appear that either of these grants in any way infringed upon the legal or equitable rights of others.

The case of Robertson's Adm'r v. Teal's Heirs was decided in 1852. These purported grants were then in existence. Lands in this area became desirable. As will later be shown, the other lands purchased by Power and Hewetson jointly in pursuance of a contract with the State of Coahuila and Texas were early forfeited by the State of Texas on the ground that same were within the ten littoral leagues, and the permission of the Supreme Government had not been obtained for the purchase.

■ For over a hundred years the Hewetson and Power headrights have been shown on the public records of the respective governments exercising the sovereignty of the soil. Boldly and frankly these records proclaim that the grants were each made to an empresario. In our opinion that they have stood this long unattacked on this ground, is a complete answer to the attack made on this ground at this late date. Barrow v. Boyles, 122 Tex. 416, 61 S.W.2d 783.

Vast sums have been expended no doubt at great risk to render these lands valuable. No attack has been made on them since the date of the grant. Neither defendants nor their predecessors in title ever had occasion to sue the Government making same or the Government now claiming same by virtue of succession to the rights of the State of Coahuila and Texas.

It is asserted that the two headright grants or surveys are void on their face through failure to describe the areas granted. The field notes, insofar as they appear in the record, have been set forth. Between September 15, 1834 and November 19, 1834, acting through Commissioner Vidaurri, the State of Coahuila and Texas made five grants within the relevant area; that is, bounded on the north by the south line of the Swisher Surveys and on the south by Copano Bay and lying, generally speaking, on Copano and Melon Creeks. The descriptions of the nine tracts or surveys comprehended within the five grants are to a large extent interdependent. It is deemed necessary to set forth such descriptions. In our opinion a perusal of these descriptions will show that each and all of these grants were contemporaneously under consideration; that taken together they exhibit the intention to include all of the relevant area. First, there is the grant of September 15, 1834, claimed by defendants to cover the areas numbered 1

and 5 on the sketch heretofore reproduced herein:

"On the same day, month and year, I, the undersigned Commissioner, in view of the foregoing decree, adjudicate in legal form to Empresarios Citizens Santiago Power and Santiago Hewetson the seven and a quarter leagues of land that they have requested, which, according to the surveys made by one of the surveyors, consist of an irregular figure at Live Oak Point where four leagues are situated, according to the special map that will be attached (Trnsl. note. No such map appears to exist in the office), which is comprised of 1,110 varas at the main point aforesaid where the survey begins until termination with a line on the lakes in a direction south, and the other (line) on those (lakes) that are to the southwest, and whose dimensions appear in detail on the special map that will be attached to this Title. Two more on Melon Creek on the other side or left margin, which appear in a square figure since the situation of the tract demands it, with 5,-280 Mexican varas front on said creek and another equal amount of depth. On the North it adjoins part of the town tract and vacant land, on the West said creek, on the South vacant land, and on the East likewise. Another league of pasture land on Copano Port with 2,640 Mexican varas on said Melon Creek, and a depth until terminating at aforesaid Alamito 10,560 varas, adjoining on the North land requested by Citizen Patricio Hearns, on the West the aforesaid creek, on the South Copano Lake, and on the East the aforesaid Alamito Creek. And finally a quarter of another league situated between Blanco Creek and the Town Tract of this Town, forming a triangular figure with 6,000 varas depth on this line, and 1,900 varas on that of dona Ysabel O'Brien's league. On the north of it adjoins said league, on the west the aforesaid Blanco Creek, on the south likewise, and on the east the Town Tract of the Town. In virtue thereof, exercising my powers and in the name of the Supreme Authorities of the Mexican Nation and of the State, I put him in possession of the aforesaid 7 leagues and a quarter which they took quietly and peacefully without any contradiction whatsoever, performing all the acts of true possession. This I provided, ordered, and signed with the parties and those of my attendance, whereto I attest.

"Jose Jesus de Vidaurri (rubic)

"Santiago Hewetson (rubic)

"Attending Witness: Attending Witness:
"John Dunn (rubic) Martin Power
 (rubic)"

Then the grant of October 24, 1834 to Robert Patrick Hearn and son, the entire record of evidence of which is here reproduced. It is as follows:

"Third Seal For the Biennium of
 (Seal)
"Two Reals 1832 and 1833, and 34

"Lord Commissioner:

"I, Citizen Patricio Hearn, a native of Ireland and at present a resident of this new town, before you in the best form of law, declare: that for six months I have been in this new colony with the purpose of belonging to it; and with the consent of its Empresarios, I have chosen a league of land a near Copano about a league east and south of the bridge of the laguna (lake), adjoining two leagues of the Empresarios, and with this assurance having claimed this tract, I pray and entreat that you may be pleased to order that I be given that which corresponds to me as a married man, as recommended by the law. I pray justice, I swear, etc.

"Refugio, Sept. 15, 1834
"Robt. Patricio Hearn (Signed)

"Furthermore: I declare, that whereas I have a single son named Santiago, I hope that you will adjudicate him the quarter league corresponding to him next to that which I requested. I swear as above. Ut Supra.

"Refugio, September 16, 1834.

"Forward to the Empresarios of this Colony in order that they may report on the civil and moral conduct of the applicant, expressing their consent with respect to his admission. This I decreed, ordered and signed with those of my attendance, I attest.

"Jose Jesus de Vidaurri (rubic)

"Attending Witness: Attending Witness:
"Juan Dunn (rubic) Martin Power
 (rubic)

"Refugio, Sept. 18, 1834.

"We, the undersigned, are informed that the applicant is a native of Ireland, of good habits, of the Catholic religion and of good behavior. Therefore, we admit him in this new Colony, considering him entitled to that land that he requests. We report to

you for your guidance pursuant to the foregoing decree.

Santiago Power (rubic)

"Santiago Hewetson (rubic)

"At the same Town on the 24th day of the month of October of the same year, I, the aforesaid Commissioner, by virtue of what I have ordered in the foregoing decree and of the consent granted by the Empresarios with respect to Citizen Patricio R. Hearn's being admitted in this Colony, adjudicate him in legal form the league of land that he has requested, whose quality is grazing land, including a labor of grazing land, with an additional quarter of another league for his single son Santiago (James) Hearn; which tract together is composed of 3,200 Mexican varas front on Melon Creek, and a depth on the upper side of 10,560 varas, and on the lower side a like amount. On the north it adjoins land requested by the Empresarios, on the west said creek, on the south a league likewise requested by the Empresarios, and on the east the creek named Alamito or Copano. In virtue thereof, exercising my powers and in the name of the Supreme Authorities of the Mexican Nation and of the State, I put him for himself and as attorney of his said son in possession of said league and a quarter of grazing land, which he took quietly and peacefully without any contradiction whatsoever, performing all the acts of true and real possession; being advised that within a year he shall construct fixed landmarks and shall observe the colonization law in the part corresponding to him, in witness whereof he signed with me and those of my attendance, whereto I attest.

"Jose Jesus de Vidaurri (rubic)

"Roberto P. Hearn (rubic)

"Attending Witness: Attending Witness:
"Juan Dunn (rubic) Martin Power (rubic)

"Note—Today this was added to the Record Book to which it corresponds on 1 used page, whereunto I set my scroll in evidence. (rubic of Jose Jesus de Vidaurri)."

The grant of October 30, 1834 to Power and Hewetson, claimed by defendants to cover area numbered 4, as designated on the sketch, and area numbered 2, so designated:

"On the same day, month, and year, I, the undersigned Commissioner, by virtue of the foregoing act, adjudicated in due form the Empresarios Citizens Santiago Power and Santiago Hewetson the ten leagues of land that they have requested, which according to the surveys made by one of the surveyors appointed are divided into two portions: the first is composed of five and a half leagues on Aranzazo Creek or imperfect triangle is comprised of 137 million five hundred thousand varas area. On the north it adjoins said Creek, on the west lands of don Felipe Roque Portilla, on the south Chiltipin Creek, and on the east the place where the two creeks join, as shown by the special plat that is attached (translator's Note: No such plat is now attached or appears to be elsewhere in the Office). The second portion is comprised of two and a half leagues on Mission Creek, which is a rectangular figure containing 62 million 500 thousand varas area. On the north it adjoins the Town Tract, on the west the aforesaid creek, on the south the lagoons or flooded lands, on the east Melon Creek. And the last of the leagues is situated on this last creek on its left margin, and both (leagues) consist of 2,640 Mexican varas front on the same creek, and a depth of ten thousand five hundred and sixty: one adjoins lands of same Empresarios on the north, the aforesaid creek on the west, land of Citizen Hearn on the south, and the Alamito or Copano Creek on the east. The other adjoins lands of said Hearn on the north, Melon Creek on the west, lands of the Empresarios on the south, and the other aforesaid Alamito or Copano Creek on the east. In virtue thereof, exercising the powers vested in me and in the name of the Supreme Authorities of the Mexican Nation and of the State, I put him in possession of them, which he took quietly and peacefully without any contradiction whatsoever, after having performed the acts of true possession, and being advised of the obligation that they consist of, they signed with me and those of my attendance.

"Jose Jesus de Vidaurri (rubic) For me and my partner Santiago Power (rubic)

"Attending Witness

"Juan Dunn (rubic) Santiago Serna rubic

"Note—Today this petition was added to the Record Book to which it corresponds on one used page; whereunto I set my scroll in evidence (rubic of Jose Jesus de Vidaurri) (Office Notes in English attached to

foregoing grant) For an Authentic Copy of the Grant for 11 leagues of land to James Power, dated 24th December, 1829, **to** which reference is made in the within petition and upon which the present Title is predicated, see 'Appendix to Empresario Contracts' Vol. 4, Folio 249, No. 12 (Spanish Archives Vol. 56, page 249) Deposited by James Power."

On same this notation appears:

"See file 15 Refugio 1st Class for Opinion of Supreme Court in case of Smith v. Power, [infra] setting aside this title."

Before proceeding with the discussion as to the areas included within these five grants insofar as relevant here, it might be well to mention that it was authoritatively established that title did not pass to any of the land in the area purported to be granted to Power and Hewetson jointly. Smith v. Power, 14 Tex. 146; Smith v. Power, 23 Tex. 29, 30. The basis of the holding was not any defect in description, but that the areas were within ten littoral leagues of the sea, and the assent of the Supreme Mexican Government had not been obtained. It is thought elementary that if in fact their location relative to the Hearn, Power and son and Hewetson headrights is relevant, the fact of the invalidity of Power and Hewetson grants is entirely immaterial.

There may be a little difficulty in applying the description to the ground as to the coast league purported to have been granted to Power and Hewetson September 15, 1834. This is designated as area No. 1 on the plat. The call for 2640 varas on Melon Creek as a western boundary, then 10,560 varas to Copano or Alamito, seems definite enough. It is not regarded of much importance that the western boundary is called for as Melon Creek when in truth and in fact Mission Bay is the real boundary. North of Mission Bay there is a confluence of Melon Creek and Mission River flowing into Mission Lake, which in turn flows into Mission Bay, which in turn is connected with Copano Bay. Some confusion arises over the call "adjoining on the north the land requested by Citizen Patricio Hearns." The grant to Hearn has heretofore been reproduced. Award was made to Hearn October 24, 1934. It will be observed that award calls for same as being bounded on the north "by the land requested by the Empresarios. On the south by a league likewise requested by the Empresarios." On October 30, 1834, a grant was made to Power and Hewetson, the Empresarios, one described as being north of the land of the Empresarios and adjoining the land of Hearn on the north. The only admissible construction is that the south boundary of this league was the north boundary of the coast league, which is the only land granted to the Empresarios to which it could refer. When we look at the calls in the Hearn grant, this is verified by the statement therein that its south boundary is land requested by the Empresarios. The coast league had before this been granted to them. The apparent contradictions appearing in the calls tend to establish that all of these grants were practically contemporaneous and all under consideration at the same time; further that their calls are interdependent.

Let us recur to the grant of the two square leagues which was made September 15, 1834, designated as area No. 5 on the plat. Here the description is somewhat unsatisfactory. It is called to be bounded on the west by Melon Creek. There is an ambiguity as to the location of the frontage on said Creek—not, we think, as to the extent of the frontage. The grant of the Hearn headright and of the third league from the coast may have been in contemplation, but had not then been made. The application of Hearn was filed September 15, 1834. The applications upon which Power and Hewetson were granted the one league immediately south of the Hearn headright and another immediately north thereof were filed September 28, 1834, and granted October 30, 1834. The Hearn headright was granted October 24, 1834. It is hardly to be thought that the grants to the Empresarios of October 30, 1834, and to Hearn of October 24, 1834, would have been made had it been conceived their west boundary had been infringed upon by the grants of the two square leagues of September 15, 1834.

On September 28, 1834, James Power made application for a headright grant for a league and a quarter as a Mexican citizen married to a native born Mexican woman, and an additional one fourth of a league for his son. This application was granted on October 20, 1834. The easterly boundary as called for was 9,138 varas on Copano or Alamito Creek, further, a depth on both sides of 10,560 varas; on the northnorthwest it was bounded by the lands awarded to James Hewetson, on the west-

southwest land of the same Empresarios. This west-southwest boundary must refer to the two square leagues. The call on the south-southeast must refer to the league granted to the Empresarios immediately north of the Hearn grant.

The fact that this division of the area lying between Copano and Melon Creeks was all under consideration at the same time and consummated contemporaneously is emphasized by the fact that the northern boundary of the Power headright refers to the Hewetson grant. The Hewetson grant was not made until November 19, 1834. The north boundary of the Hewetson is vacant land. Its westerly boundary is 2,640 varas on Melon Creek, the easterly boundary Copano Creek; depth of the grant, 10,560 varas. The quarter league has a frontage of 1419 Mexican varas on Copano, its northern, the previously described league of the Hewetson grant, on the west-southwest that of both Empresarios, on the east-southeast the Power land, and on the east-northeast aforesaid Melon Creek.

Considering these five grants as a whole this fact is outstanding: that their calls are interdependent; further, each is intended to apply to the same general area; all were made between September 15, 1834 and November 19, 1834. There is intrinsic evidence within the calls of the grant that all were under consideration and in the process of consummation at or about the same time. An instance of this is the case of the Power and son grant, which was made on October 20, 1834, according to the final order. This grant calls for the Hewetson. The final order consummating the Hewetson grant was made on November 19, 1834. It must be further borne in mind that under the law applicable vacancies between grants were to be avoided.

■ The purpose of this grant was to colonize a wild, sparsely settled area; care was used in the selection of the settlers. Such as were allowed to settle were to be bound to the State by ties of self-interest. In dealing with ancient grants of a foreign government, the preceding sovereign, the State of Texas has, in compliance with her legal duty, dealt liberally and generously,

especially is this true where same have been called into question long after their consummation. Hancock v. McKinney, 7 Tex. 384; Ruis' Heirs v. Chambers, 15 Tex. 586; Jenkins v. Chambers, 9 Tex. 167; Burleson v. McGehee, 15 Tex. 375; Bissell v. Haynes, 9 Tex. 556; Hardiman v. Herbert, 11 Tex. 656; Hatch v. Dunn, 11 Tex. 708; Kilpatrick v. Sisneros, 23 Tex. 113; Mc-Mullen v. Hodge, 5 Tex. 34; Swift v. Herrera, 9 Tex. 263; Hardy v. De Leon, 5 Tex. 211; Jones v. Garza, 11 Tex. 186; Norton v. Mitchell, 13 Tex. 47; Johnston v. Smith, 21 Tex. 722; Jones v. Muisbach, 26 Tex. 235; Howard v. Colquhoun, 28 Tex. 134; Cavazos v. Trevino, 35 Tex. 133; Blythe v. Houston, 46 Tex. 65; Groesbeck v. Golden, Tex.Sup., 7 S.W. 362; Smith v. Walton, 82 Tex. 547, 18 S.W. 217; McGehee v. Dwyer, 22 Tex. 435, 436; Styles v. Gray, 10 Tex. 503.

O'Sullivan, a licensed State Surveyor, in his survey of 1892, took the creek calls as meaning a base rather than a meandered line. In this survey he marked on the ground the south line of the Swisher Surveys. This survey is conceded by plaintiffs and the State to correctly delineate such line. The monuments established by him in the delineation of this line exist today.

In the patent calls of the various Swisher Surveys, the north line of the Hewetson is called for numerous times. If the north line of the Hewetson is coincident with the south line of the Swisher Surveys, this disposes of most of the contentions of plaintiffs and the State, all save that of excess and abandonment by Dr. Hewetson.

O'Sullivan returned a map of his work. In connection with his work it was necessary for him to locate the north line of the Hewetson. This was true, because in the grant of the Hewetson headright, the northern boundary was given as vacant land. His manifest purpose was to include in his surveys of the Swisher the vacant land down to the north line of the Hewetson.

Inserted here is a portion of the map of O'Sullivan as to the relevant area taken from page 43 of defendants' brief:

—43

APPELLEES'
MAP № 6

Upon the patent of the Swisher Surveys the General Land Office map was corrected in 1896 in accordance with this map. The official county map of 1921 also was in accordance with the O'Sullivan map above reproduced.

Before making a survey Dellis, who had been appointed by the Land Commissioner to survey and report on the applications of plaintiffs, was furnished by the Land Office with what is known as a "working sketch," which no doubt reflected the data on file in the Land Office with reference to relevant areas. This sketch shows the Hewetson and Power headright in the same relative position with reference to the Swisher Surveys as was shown by O'Sullivan.

As has been heretofore mentioned, the grants in this area to the Empresarios were in an early day declared invalid by the Supreme Court. Smith v. Power, 14 Tex. 146; Smith v. Power, 23 Tex. 29, 30. In

declaring these grants void, the Supreme Court made no mention of any lack of the sufficiency of the description. Same were held void on the ground heretofore mentioned. Subsequent thereto applications were made to purchase in these areas supposed to have been included in the grants to the Empresarios. In connection with these applications surveys were made by Surveyors Richardson and Talley and Surveyor Ward. Patents were issued by the State in accordance with such surveys. Based on the Richardson surveys, the State issued three or more patents in the area of the two square leagues as indicated on the sketch or plat first reproduced in this opinion. Also three surveys were based on Richardson's work which were in conflict with the Hearn headright as shown on the O'Sullivan map.

In 1876, in pursuance of a resurvey by Surveyor Ward, these were repatented and the conflicts eliminated. Also in accordance with the survey made by Surveyor Lee, the R. Oliver was granted in conflict with Hearn, but was subsequently lifted on account of the conflict, and the certificate was relocated in another part of the State.

In 1873 the Pablo Ortiz, in 1874 the Daniel Young, Ashbell Tuttle and S. Gibson were patented on surveys of Surveyor Dale. These surveys occupied the area of the league just north of the Patrick Hearn headright granted to the Empresarios. The Ortiz began at the upper corner of the Hearn. It likewise calls for the south line of the Power headright. The Young begins at a designated point in the north line of Hearn. It likewise calls for the south line of Power at 2,640 varas from the north line of Hearn.

In numerous instances patents were issued by the State prior to the O'Sullivan surveys with calls for the lines of these headrights involved, recognizing their position as shown on the O'Sullivan map. It is said that O'Sullivan, in the location of the south line of the Swisher surveys, located the south line of the Hearn as called for by a previous survey, totalled the calls running north on a practically perpendicular line and thus established the south line of the Swisher. The calls totalled the calls running north for river frontage. If this is what he did, then his measurements were correct, the testimony of Surveyors Boyles and Young attested the distance from the southerly line of the coast league to the south line of Swisher is from 24,317 to 24,320 varas. For the distance from the south line of the coast league to the south line of the Hearn, he relied on the Dale survey. Ward in his survey evidently interpreted the call for frontage to be a perpendicular line rather than a meander line of the stream.

Surveyor Fenner, a witness for the plaintiffs, presented a theory of the construction of these old grants on an acreage basis. His construction thereof shows the surveys as in the relative position as shown by the sketch herein first reproduced, except that it would place the north line of the Hewetson over 2,600 varas south of the south line of Swisher.

■■ Several times we have mentioned that the calls made in patents issued subsequent to these grants by the State made calls for the lines of these old grants—made calls for their location and position in accordance with their location as indicated on the O'Sullivan map and as their location is claimed by the defendants in this appeal. It is true that the lines of a senior grant cannot ordinarily be located by the calls of a junior grant. This statement is made with reference to patents issued by the State of Texas, and not to the grants made by the State of Coahuila and Texas in the relevant area. However, as will appear later herein, we believe, taken in consideration with other evidence, these calls made in the patents of the State have an evidentiary bearing on some of the other issues tendered herein. In regard to the calls made in the relevant grants by the State of Coahuila and Texas, we think these grants were contemporaneous and the calls in any grant may be used for locative purposes.

In the case of the surveys made in these grants, the surveyor seems to have been strictly the agent of the State of Coahuila and Texas. There were several official surveyors on the staff of Commissioner Vidaurri. The applicant seems not to have initiated his application by a survey, but applied in most general terms for the land he desired.

■■ Let us recur again to the language of the order finally consummating the Power and Hewetson headrights. In the Power grant it is recited the land which was apportioned to him had been surveyed by one of the surveyors appointed. One of the attending witnesses is Loupy, a surveyor on the staff of Vidaurri. It

is also recited in this grant that the Commissioner placed the said Power in possession of the property. This we take it to be tantamount to a delivery of juridical possession as known to the civil law applicable thereto. In the case of the Hewetson headright, it likewise recites that it was made according to the surveys made by one of the surveyors appointed; likewise recites the delivery of juridical possession taken on behalf of Hewetson by Power. These two grants, as we have reproduced them, were all the written evidence defendants were able to introduce in substantiation of the grants from Coahuila and Texas. They attest that surveys were made and that juridical possession was delivered to the areas here in controversy. There is no written evidence of what the survey was, save and except as contained in the grant. If there was a survey the field notes thereof would perhaps render this case very simple. It was certainly Commissioner Vidaurri's duty to have a survey made. There is a presumption a survey was made. In our opinion the rather general statement in the grant that a survey was made, even though when taken in connection with the evidence, fails to rebut this presumption. It is true that the State does not part with title to an individual except by a grant, and this statement we think holds true as to the State of Texas and to the State of Coahuila and Texas. State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065. However, the writing evidencing the act in law constituting the grant is not the grant, but mere evidence thereof. It may be that the grant must be evidenced by writing; but even though the writing cannot be produced, if the contents of the writing be proven by legal evidence, it is as efficacious as though the writing were produced.

■ Furthermore, it is fundamental that a state cannot be divested of a proprietary title by limitation, laches, recognition, etc., she is not bound by the defaults or negligence of her officers or agents. Day Land & Cattle Co. v. State, 68 Tex. 526, 4 S.W. 865; Jones v. Robison, 104 Tex. 70, 133 S.W. 879; Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259; Grayburg Oil Co. v. State, Tex.Civ.App., 50 S.W.2d 355, writ refused.

Defendants do not rely on a title emanating from the State of Texas. Her claim is succession to a title by conquest. Defendants do not claim title by limitation, estoppel or kindred matters. Defendants rely solely on title from the State of Coahuila and Texas.

In the light of the issue presented, let us briefly consider the attitude of the three governments concerned as to this land, without at this time considering the legal effect thereof.

These grants, until this action, have never been questioned either by the State of Coahuila and Texas, the Republic of Texas, or the State of Texas. Within a comparatively short time after these grants were made, the State of Coahuila and Texas was overthrown. Her successor, the Republic of Texas, mindful of her obligation under the law, authorized the filing in the General Land Office of evidence of grants made by her predecessor. In pursuance of that law, the predecessors in title of the defendants filed these grants in the General Land Office in 1840. Insofar as the land granted jointly to the Empresarios, she promptly challenged the validity thereof. (We presume that the defendant in Smith v. Power, 14 Tex. 146, claimed under a grant from the State of Texas.) This challenge was successful. She has never to this date made a grant which was allowed to stand in conflict with the Hearn, in conflict with the areas here involved in the Power or Hewetson. During most if not all of this time, if these areas were unappropriated public domain, her succeeding Land Commissioners were under the duty of selling same under application made in accordance with law. Her official maps show these lands as titled lands—not until shortly after 1892 were the Hewetson and Power shown in the exact location as contended by defendants; however the Hearn, although not involved herein except as it throws light on the location of the Power and Hewetson headrights, was shown on such maps from an early date in the position contended for here. It is shown in evidence that the State of Texas from 1879 had collected taxes from the predecessors in title of defendants and defendants on these very lands. The burden of taxation appears to have been cheerfully borne except in one instance, where it was coerced by the State. The reference here is to the proceeding in the case of Quintana Petroleum Co. v. State, Tex.Civ.App., 127 S.W.2d 354; State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 134 S.W.2d 1016, 128 A.L.R. 843, 850. This case will be later discussed.

In the early 70's, Thomas O'Connon (a former soldier in the Army of General Houston), the grandfather of Thomas O'Connor, one of the defendants here, and a successor in title to the grantees in the Power and Hewetson headrights, entered into active possession of the land in controversy. That possession has been consistently and continuously maintained from that day to this. From 1892, when O'Sullivan made his survey and marked on the ground the south line of the Swisher Surveys, the extent of the possession has been marked and well defined. On this area there are over seventy oil wells in operation, were so in operation when the plaintiffs filed their respective applications to purchase.

In the petition of intervention of the State herein the following appears:

"This suit is brought by the Attorney General in his official capacity as authorized and directed by Section 11 of Chapter 4, General Laws of the 27th Legislature, First Called Session, 1901, and Articles 5420 and 5421c, Section 6j, of Vernon's Annotated Civil Statutes of Texas, and Title 124 of the Revised Statutes of 1925."

Section 11, Chap. 4, page 6, Acts of the First Called Session, General Laws of the 27th Legislature, is as follows:

"The Attorney General of this State is hereby directed and required to institute and prosecute in the name of the State of Texas, such suits as may be necessary to recover from the person or persons in possession thereof or claiming title thereto, all lands which are held or claimed under titles emanating from the Spanish or Mexican governments where no valid evidences of such grants are to be found in the records or among the files of the General Land Office; and also such suits as may be necessary to determine the exact location and boundaries of such lands, where the evidences on file in the General Land Office does not sufficiently identify the land claimed; and such suits shall be brought, prosecuted and tried in the district court of Travis county, Texas."

 The State asserts here these grants are void on their face for lack of description. From 1840 such paper evidence as was introduced on the trial of this case was on file in the General Land Office. From 1846 to the date of the filing of this petition the State has had as Attorney Generals many men of the highest integrity and great lawyers. We shall not enumerate them all, but mention only a few: James Wille, William Steadman, W. M. Walton, George Clark, John D. Templeton, James S. Hogg, Charles A. Culberson, M. M. Crane, T. S. Smith, Charles K. Bell, R. V. Davidson, Jewell P. Lightfoot, James D. Walthall, B. L. Looney, C. M. Cureton, W. A. Keeling, Dan Moody, Claude Pollard, Robert Lee Bobbitt, James V. Allred, William McGraw. Some of these gentlemen, after their services as Attorney General ceased, were honored by the people of the State by election to the highest executive and judicial positions within the gift of the people. Before the Act of 1901, above quoted, we think it was in the purview of the duties of the Attorney General to recover for the State land illegally withheld. The Act quoted made it their specific duty to institute legal proceedings on behalf of the State under the conditions named in the law quoted. Are we to assume that these honored, distinguished and able gentlemen neglected their duty? or are we to apply the presumptions that they discharged their official duty with fidelity and diligence? The answer is, we think, that they are presumed to have discharged their official duty with fidelity and diligence.

 Such written evidence of these grants as was introduced here was on file in the General Land Office from 1840. An interpretation thereof by the General Land Office in accordance with the contentions of the defendants here has been reflected by the maps relating to this area on file in that office. A grant is but the execution of a contract. The State here, that is, the responsible officers of the State acting in the scope of their powers, has construed not the grant of the State of Texas, but the grant of the State of Coahuila and Texas in this manner for many years. From this, is it unjust or illogical to draw a deduction that this was the grant? Is the law that the defense of limitation is not available against the State and she is not estopped by the defaults of her officers violated in presuming, as a matter of law, that there was a grant and these were the bounds and limits thereof? We think not.

 This proposition is taken to be elementary, that essential to a valid grant of land from any government is authority on the part of the official assuming same to make the grant and the identification of the

land granted. The element of authority is as much of the essence of a grant as that of description. On this branch of the case, we think the case of Barrow v. Boyles, 122 Tex. 416, 61 S.W.2d 783, 787, is very much in point. In that case a Mexican title emanating from the State of Coahuila and Texas was in question. It was approved by the Governor on October 25, 1828, and title was extended from the State of Coahuila and Texas on June 1, 1831. The ground of attack on the grant was that the Commissioner extended the title without the knowledge, assent or approbation of the Federal Executive of Mexico, as required by the governing Mexican Law. True, the grant did recite that such assent had been obtained. However, the holding of the Supreme Court and the reasons therefor, as gathered from the opinion written for the court by Justice Greenwood, seem not to have been based on this recital. It was there said:

"Should we accept plaintiff in error's views, we should adjudge that the officials of no less than three governments, including our own Texas commissioners of the general land office and Attorneys General, have been derelict in duty during the periods of some three generations. Not a fact is averred at all sufficing to negative the presumption of the rightful exercise of official power as it is disclosed by plaintiff in error's own petition."

If we interpret this case correctly, the power and the exercise thereof of an official of a preceding sovereignty to extend a grant was presumed from the acts of the responsible officers of the State of Texas over a long period of time. If the Supreme Government of Mexico did give assent to this grant, it was no doubt evidenced by writing. In assenting to an act in law binding on the government, it is hardly to be presumed that a high official would not evidence his assent by writing. No such writing was in evidence in the case. The law as pronounced in Barrow v. Boyles, supra, is the law today. The law as there pronounced is supported by reason and logic. It was in accord with the precedents theretofore announced. If we correctly read the opinion, it is not held that the State lost a title by limitation nor by defaults on the part of its officers. It was held that from the acts and attitude of the responsible officers of the State toward the grant of Coahuila and Texas, that the State of Texas never had a title to lose.

The approbation of the Supreme Government is a question of fact, and the burden is upon the grantee to prove same. It may even be a question for the jury. Edwards v. Davis, 3 Tex. 321; Republic of Texas v. Thorn, 3 Tex. 499; Goode v. McQueen's Heirs, 3 Tex. 241.

We have stated that the power to make a grant is essential to its validity, as essential as the identification of the thing granted. Even though power ordinarily is delegated to an official by law, whether such official exercises same is a question of fact. The fact of the exercise of a delegated power in a certain way was presumed from the acts of the responsible officials of Texas, in no way essentially different from the acts of such officials here involved. The question here is, were the grants valid, and what was their extent.

Where there is an ambiguity in the grant of the preceding government the conduct of the succeeding government may be looked to to determine the limits thereof. Von Rosenberg v. Haynes, 85 Tex. 357, 20 S.W. 143; State v. Bruni, 37 Tex.Civ.App. 2, 83 S.W. 209, writ denied.

In State v. Bruni, supra, as we understand the case, the forty years' possession of the defendant prior to the institution of the suit for the land was considered in determining that there was a grant of the land by the prior government and likewise as to the limits thereof.

In our opinion the facts appearing in evidence amply sustain the conclusion of the trial judge that, as a matter of law, the south line of the Swisher Surveys was coincidental with the north line of the Hewetson headright.

It is thought that what has been said demonstrates that the action of the trial court was correct in instructing a verdict against the plaintiffs and the State.

The briefs of the parties herein constitute over a thousand written pages. Great principles and a vast amount of property are involved. This is the only palliation for prolonging this opinion.

It is said that the defendants used the Texas vara of thirty-three and one third inches in their construction of these grants; that instead of the Texas vara, the Mexican vara should have been used, which is shorter; that if the north line of Hewetson be determined in accordance with the length of a Mexican vara, the north line of the Hewetson headright will be south of

the south line of the well marked Swisher Surveys. The brief of each party reflects painstaking and careful research on this issue.

■ In our opinion the proposition asserted by defendants in their brief is sustained by the authorities cited by them. We adopt from the brief of defendants this statement in disposing of this issue:

"Any vara in use for land measurement in Coahuila and Texas, in 1834, was necessarily a 'Mexican vara;' and the Mexican vara prescribed by statute by the Coahuila and Texas statutes of that period was actually longer than the vara in customary use in Texas for the past 120 years." General Colonization Law of Coahuila and Texas, of March 24, 1825, (Decree No. 16); Gammel's Laws of Texas, 1, p. 127; Art. 573, Paschal's Digest, Vol. 1, p. 213; Art. 47, Sayles' Early Laws of Texas, Vol. 1, p. 66; General Colonization Law of Coahuila and Texas, of April 28, 1832, (Decree No. 190); Gammel's Laws of Texas, 1, p. 300; Art. 677, Paschal's Digest, Vol. 1, p. 223; Art. 58, Sayles' Early Laws of Texas, Vol. 1, p. 83; Decree No. 272, of March 26, 1834, Coahuila and Texas; Gammel's Laws of Texas, 1, pp. 357–358; Paschal's Digest, Art. 709, Vol. 1, p. 225; Art. 66, Sayles' Early Laws of Texas, Vol. 1, pp. 97–102; Section 2, Act of Congress of the Republic of Texas, approved January 19, 1840, adopting the Common Law; United States v. Perot, 98 U.S. 428, 25 L.Ed. 251; Art. 5730, Revised Civil Statutes of Texas, 1925 (General Laws, 1919, p. 232); Art. 5300a, Sections 5–7, Vernon's [Ann.] Civil Statutes (Ch. 354, p. 611, Acts 48th Leg. 1943).

It is contended by the State and plaintiffs that the title to the Hewetson headright became vested in the State of Coahuila and Texas or the Republic of Mexico by virtue of the abandonment thereof by Dr. Hewetson between the date of the grant and January 20, 1840. January 20, 1840 was when the common law was adopted as the rule of decision in the Republic of Texas.

■ Plaintiffs concede that loss of title to land by abandonment is unknown to the common law. However, it is argued that at all times prior to January 20, 1840, this land was governed by the Mexican law, which does recognize the loss of title by abandonment. The civil law in this respect is said to be well stated in the copy of the charge of the learned trial judge appearing in the case of Allen v. West Lumber Co., Tex.Com.App., 244 S.W. 499, 500. This charge was as follows:

"At the time the league of land in controversy was granted, in 1835, the law was if a man be dissatisfied with his immovable estate and abandoned it, corporeally, with the intention that it shall no longer be his property, his interest therein ceased."

Judge Powell in the opinion states that the basis of the law as declared by the trial court was to be found in Law 50, Las Siete Partidas. The quoted portion of Law 50 is as follows:

"If a man be dissatisfied with his immovable estate and abandon it, immediately he departs from it corporeally, with an intention that it shall no longer be his, it will become the property of him who first enters thereon."

This provision of the Partidas does not seem to provide that the title to land upon abandonment shall vest in the State. It seems to be in accordance with the common law as to the abandonment of corporeal personal property.

■ But for the purposes of this case, let us assume, upon abandonment, title vested in the State. Our belief is that the civil law as to abandonment at the relevant time was as asserted by plaintiffs. Sideck v. Duran, 67 Tex. 256, 3 S.W. 264; Allen v. West Lbr. Co., Tex.Com.App., 244 S.W. 499, and cases cited.

A perusal of the law indicates that corporeal departure is not sufficient, but it must be coupled with the intention of abandonment. This is the construction of the two cases cited above.

■■ It must be that one asserting that title to land once granted has been lost by abandonment, has the burden of showing by evidence that there was such abandonment. In order to show this, the evidence must show something more than a lack of corporeal possession. To raise the issue of abandonment, the State relied upon the fact that when the administrator of Dr. Hewetson's estate filed in 1871 the inventory of the estate, the Hewetson headright was not listed as part of his estate. This probate proceeding recited that Dr. Hewetson was a resident of Saltillo, Mexico. If he was, we can hardly think Art. 30 of the Colonization Law applied to him. 1 Gammel's Laws, p. 20.

Plaintiffs do not so contend, if we properly understand their position. Granted that Dr. Hewetson remained a citizen of Mexico, he did not take up his residence in a foreign state within the meaning of Art. 30 of said Colonization Law. The record of the probate proceedings in the Dr. Hewetson estate showed that the heirs had taken possession of the estate before its close. Hard upon the close of the Hewetson estate, or maybe during the pendency of the administration, the conveyance by the Hewetson heirs was made to Thomas O'Connor, the grandfather of the defendant Thomas O'Connor. Said defendant O'Connor's ancestors entered immediately into active possession of the Hewetson headright, and active possession and dominion has been continuously maintained ever since down to the date of this trial. In our opinion the issue of abandonment was not raised by the evidence.

In Sideck v. Duran, supra, it was applied with reluctance. There was record evidence there that was practically conclusive. In Allen v. West Lumber Co., supra, eighty years of consistent non-claiming was held sufficient to raise the issue.

Here we have a country torn by war and revolution. There is no evidence, we take it, unless we have overlooked part of the statement of facts, that from the date of the grant to his death Dr. Hewetson ever paid any taxes on his property. This is not evidence that he did not. No evidence that taxes were assessed in such a manner against this property that they could be paid. From about 1879 on, with one exception, it appears that the original Thomas O'Connor and his successors in title have paid taxes without coercion. Over sixty years of official conduct by the responsible officers of the State of Texas acting in the scope of their official duties, attest that Dr. Hewetson never abandoned this land.

■ To that part of the contentions made by plaintiffs and the State as to the alienage of Dr. Hewetson, we know of no better answer than Maxey v. O'Connor, 23 Tex. 234. It was there said by Chief Justice Wheeler:

"The objection, that one of the grantees had removed from Texas to another of the states of Mexico before the revolution, and did not return to the Republic or State, is answered by the fact, that his title was acquired before the revolution * * *.

Kilpatrick v. Sisneros, supra, 113, Jones v. McMasters, 20 How. 8, 20, 21 [15 L.Ed. 805]."

This language was used in reference to a grant made to Dr. James Hewetson on October 12, 1834. At the time it was used proof as to the residence and citizenship of Dr. Hewetson was, from the nature of things, more available than at the present time.

Dr. Hewetson, in 1866, was the owner of the soil of the Hewetson headright. Section 39, Art. 7, of the Constitution of 1866, was as follows:

"That the State of Texas hereby releases to the owner of the soil all mines and mineral substances that may be on the same, subject to such uniform rate of taxation as the legislature may impose. * * *"

The Constitution of 1869, Sec. 9, Art. 10, is of the same purport and tenor, as is likewise Section 7, Art. 14, of the Constitution of 1876 Vernon's Ann.St. See also State v. Parker, 61 Tex. 265; Cox v. Robison, 105 Tex. 426, 150 S.W. 1149.

■ In our opinion, under the provisions of the Constitution, the title to the minerals underlying the Hewetson headright vested in Dr. Hewetson and are now vested in his successors in title. This holding in no way conflicts with Hanrick v. Hanrick, 54 Tex. 101; Id., 61 Tex. 596. The case of Quintana Petroleum Co. v. State, Tex.Civ.App., 127 S.W.2d 354; State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 134 S.W.2d 1016, 128 A. L.R. 843, 850, while not in our opinion conclusive on the matter, strongly supports our holding in this respect.

Thomas O'Connor in that case, failed to list for taxation an interest in 7/32nds of the oil to be produced by lessors. This was assessed as against him by a responsible subdivision of the State. The Supreme Court held that he was under legal obligation to pay taxes thereon. Under such holdings some $32,000 or more was paid as taxes. It may be that title is not an issue in a tax suit. If it is not an issue, it is assumed by each party. It is sought to hold the defendants liable to the State for the full value of the oil extracted from these premises upon which the State exacted over thirty-two thousand dollars in taxes. At the time of this proceeding the great value and the immense potential value of these lands had been demonstrated.

In the two headrights involved there is an excess. This excess is no greater than was customary and usual in Mexican surveys made in the same general area and about the same time. Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95; State v. Russell, 38 Tex.Civ.App. 13, 85 S.W. 288, writ refused; State v. Palacios, Tex. Civ.App., 150 S.W. 229, writ refused; Schaeffer v. Berry, 62 Tex. 705; Land v. Dunn, Tex.Civ.App., 241 S.W. 580; State v. Texas Land & Cattle Co., 34 Tex.Civ. App. 460, 78 S.W. 957; State v. Indio Cattle Co., Tex.Civ.App., 154 S.W.2d 308; Maxey v. O'Connor, 23 Tex. 234; Welder v. Carroll, 29 Tex. 317; White v. Burnley, 20 How. 235, 15 L.Ed. 886.

■ Not in respect to excess, but as indicating the liberality with which these ancient grants should be construed, the case of Hamilton v. Menifee, 11 Tex. 718, is worthy of note; worthy of note likewise for the reason that in one of the summarized briefs of counsel, the boundaries of the Hewetson and Power empresa are set forth. Chief Justice Hemphill there said, as to the question as to whether the lands involved were within or without the Power and Hewetson empresa:

"It would be an act of great injustice to permit titles fairly and honestly granted, with reference to a line of boundary, not traced by the Government, but honestly determined upon by the authorities, on the best light which they had on the subject, to be now impeached, because they are two or three miles within or without what may now be supposed to be the exact line. *Exactness was difficult of attainment and should not be insisted upon, to the destruction of right.*" (Italics ours.)

By the way of digression, it may be remarked that unless a straight line be used for the demarcation of the coast line, it would be difficult indeed to determine whether an area was ten littoral leagues from the sea. In fact, as we gather from Hamilton v. Menifee, supra, this was determined on the basis of a straight line. The surveyors assisting Vidaurri may have adopted this theory. In the light of the boundaries set forth for the empresa, this would not seem to be glaringly incorrect. The surveyors preceding O'Sullivan and O'Sullivan may have adopted the same theory.

■ In determining the location of these two headrights we have not discussed the part the delivery of juridical possession, as recited in the two grants in question, may play in the matter of location and limits of these grants. Plaintiffs and the State say that it cannot be a factor; that the grants purport to set out the location and the limits of the land, and that was the land delivered to the grantee; that the description cannot be applied to any land.

Assent is not given to this proposition. While the descriptions are not as definite and certain as could be desired, in a general sort of way they seem to have been the customary descriptions in this sort of grants. As has been said, the papers introduced do not appear to reflect all the steps in the granting of these lands. If a survey was made, and the grants recite a survey, and you could hardly expect evidence to be on the ground after the lapse of something over one hundred and eight years, the grantee assumed the obligation of erecting the monuments. Unless a survey had been made, this might be a difficult task. In cases of grants it would seem to be the custom of surveyors to make a map of their field notes. No map of the surveyor or surveyors acting under Commissioner Vidaurri appears. But in view of the long lapse of time, attended not only with the ordinary casualties of time, but with war and revolution, it would not be stranger if same had disappeared.

In our opinion, the delivery of possession has some bearing here on the location of these grants. White v. Holliday, 11 Tex. 606; State v. Russell, 38 Tex. Civ.App. 13, 85 S.W. 288; Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95; State v. Corrigan, Tex.Sup., 95 S.W. 101; State v. Palacios, Tex.Civ.App., 150 S.W. 229; Graham v. United States, 71 U.S. 259, 4 Wall. 259, 18 L.Ed. 334.

Without some marking or indication of boundaries, temporary though they might be, a delivery of juridical possession to an area would seem impossible. Many positive acts and forbearances on the part of the State of Texas extended continuously over a long period of years evidences the area involved in the delivery of such possession.

What land did Commissioner Vidaurri deliver to Dr. James Hewetson on or prior to November 19, 1834? The answer is, we think, the land now bounded on the north by the south line of the Swisher Surveys, as marked and established by

O'Sullivan. This answer is justified by over one hundred years acquiescence by the Governments of Coahuila and Texas, the Republic of Texas, and the State of Texas; not only by acquiescence, but by numerous other particular acts, particularly by the State of Texas, attesting that the aforesaid line is as before stated. Thus is such line established as a matter of law. Any other holding would inpugn the fidelity and integrity of each Attorney General holding office in the State of Texas, and so as to the Land Commissioners.

The attitude and public policy of the State is well set forth in the Emergency Clause, Chapter 3, General Laws 46th Legislature of Texas, 1939, p. 465. This Act in part at least authorizes the maintenance of the action maintained by plaintiffs herein. When we consider the provisions of the Act in connection with the holding of the Supreme Court a short time before in the case of Short v. W. T. Carter & Bro., 133 Tex. 202, 126 S.W.2d 953, which set forth the prima facie effect of the granting of an application to purchase by the Land Commissioner, the public policy of the State stands forth. The Act indicates a general intention to protect titles long asserted. In substance, the law provides that where an application to purchase land which has long been claimed in good faith by others, a survey is required, an opportunity for a hearing of a sort is accorded. Such application is not to be lightly granted by the Land Commissioner, but only after a painstaking investigation of the facts. In this case, after what appears to be such an investigation, the Land Commissioner rejected the applications of plaintiffs. In our opinion, in the light of the facts appearing in this record, his action was proper.

In our opinion the evidence fails to show the right of plaintiffs to the leases sought, that the State has title to this area. In fact, in our opinion, evidence established as a matter of law that the title to this property is in the successors in title of Dr. James Hewetson and James Power.

The fact here presumed is that the grants from the State of Coahuila and Texas included the area claimed by defendants. The basis of such presumption is the course of conduct on the part of the duly authorized officers of the State of Texas inconsistent with any other reasonable conclusion. This conduct is viewed in rela-

tion to the long asserted claim of defendants and their predecessors in title evidenced by their possession and improvements of the property. A grant is not presumed from the State of Texas. The State of Texas has not lost anything, because under the premises she had nothing to lose. Ever since the State of Texas came into being she has treated this area as titled land. The basis for treating same as titled land could be naught but the assumption on the part of the officers of the State that the Mexican grants covered the area in question. Since 1840 the evidence of these grants has been in the General Land Office. Much of the time the Attorney General has been charged with the duty of taking action if same were invalid,—so as to the Land Commissioner. Any inference other than that the facts did not exist which authorized the seeking of the recovery of this area would brand the memory of a long line of able and upright officials with neglect of official duty. Most certainly, under the law of 1901, a portion of which we have quoted in this opinion, it became the duty of the Attorney General to examine these very grants. It is to be presumed that he did so. Such is the presumption as to the various Land Commissioners.

At all times it must be borne in mind that the conduct of the State was not with reference to one of her own grants,—not as to a grant, the validity and extent of which was to be determined by her own laws, in a sense. The grant in this respect was governed by the law of the State of Coahuila and Texas, which became the domestic law relative thereto by the replacement of the foreign government by the domestic government. These grants were not to citizens either of the Republic of Texas or the State of Texas, for neither of those governments was in existence on the date of the grants. A proprietary title to any part of the territory in controversy was never vested in the State of Texas.

From a long elapse of time the presumption of payment arises against the State. See McKinney v. Freestone County, Tex.Com.App., 291 S.W. 529. The presumption applied here is of the same intrinsic character, although it does not depend on the elapse of time alone.

Even though a boundary may not be fixed between the State and a grantee claiming under a Mexican grant by a long acquiescence, operating as a contract or

by the way of estoppel, absent better evidence it may be considered in establishing the actual boundary. Ballard v. Stanolind Oil & Gas Co., 5 Cir., 80 F.2d 588.

The trial court properly instructed a verdict in favor of the defendants against the plaintiffs and the State and its judgment is in all things affirmed.

McGILL, Justice (concurring).

I concur in affirmance of the trial court's judgment. The only patents ever issued by the State which today are in apparent conflict with the location of the Hewetson headright as reflected by the O'Sullivan Survey are the Timothy Hoyt, surveyed by Richardson in 1840, and the G. W. Maine, William Williams, and the two Isaac H. McMichael patents, surveyed by Ward in 1874. Prior to the O'Sullivan survey the State had assumed that the north line of the Hewetson headright was considerably north of where the Swisher patents called for it to be. This assumption is evidenced by the above patents and the maps of Refugio County. On this assumption the State respected the area subsequently included in the Swisher Surveys as titled land—land included within the Hewetson headright league. It sold land bordering on the north thereof. It issued the above patents, the surveys for the north lines of the G. W. Maine and William Williams calling for their north lines to be coincident with the southeast line of the Hewetson. Prior to the O'Sullivan survey, Thomas O'Connor, the grandfather of Thomas O'Connor, one of appellees, had purchased all of the above surveys. It is conceded that he had acquired title to all land included in the Hewetson and Power and Son headrights, if such headrights can be located at all. Unquestionably, the purpose of O'Connor in having the O'Sullivan survey made was to acquire title to any land lying between the north line of the Hewetson and the south lines of the surveys lying north of it. The Swisher patents, by their calls, evidence an intention on the part of the State to convey this area. The State was not interested in how far south of its theretofore assumed position the north line of the Hewetson was called for in the Swisher patents. Any conflict with prior patents was of no consequence, since O'Connor owned all lands covered by such patents. Therefore, the apparent existing conflict between these prior patents and the Hewet-

son headright, reflected by the O'Sullivan survey, is of no evidentiary value. It in no way detracts from the affirmative acts of the State evidencing the true location of the Hewetson as contended for by appellees. The assumption of the Land Commissioner and of O'Connor was that O'Sullivan's monuments marking the south lines of the Swisher Surveys also marked the north line of the Hewetson headright. This has been the assumption of every Land Commissioner since the O'Sullivan survey was made. Every Attorney General has been specifically charged with the duty of investigating the validity and extent of the Hewetson and the Power and son headrights since 1901. In the absence of evidence to the contrary, a presumption must be indulged that this duty was faithfully performed. During the last fifty years O'Connor and his successors in title have expended vast sums of money and developed an oil field of great value on the location of these headright grants reflected by the O'Sullivan survey. The State continued to act on the assumption that the area was titled land owned by O'Connor after the discovery of oil thereon. Through its Attorney General it sought to and did impose taxes on a reserved mineral interest in the oil field. Quintana Petroleum Co. v. State, Tex.Civ. App., 127 S.W.2d 354; State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 134 S.W.2d 1016, 128 A.L.R. 843, 850. At this very time it knew that O'Connor's title depended on the grants here under consideration. While the Quintana case may not operate as a judicial estoppel against the State, it is the culmination of a long line of unequivocal acts on the part of the State which warrant and compel the inference that the north line of the Hewetson headright as granted by the State of Coahuila and Texas is coincidental with the south line of the Swisher Surveys. The integrity of the State of Texas admits of no other inference.

SUTTON, Justice (dissenting).

This writer finds himself unable to agree with the majority opinion in one important detail, to-wit, the construction given the calls in the several grants wherein calls are made, "with 2640 Mexican varas on such Melon Creek," and "fronting on Melon Creek 2640 Mexican varas," etc. The construction contended for; that adopted by the majority, and employed by the Surveyor O'Sullivan in 1892, con-

strues such calls to mean the perpendicular distance between parallel lines drawn off of such Creek.

The writer readily assents to· the conclusion the grants are in all respects valid and that the land may be located, but these lands must be located like any others, from the descriptive calls in the grants or conveyances, and may not be located from a recognition of the boundaries as established by O'Sullivan, errors in judgment or the failure to act on the part of the State's officials. It is true the official county maps have since 1892 shown these lands as bounded on the north by the south line of the Swisher surveys. Prior to that time the maps showed the north boundary to be coincident with the north line of the now Swisher surveys. All that is said and that may be said on behalf of the northern area of these lands could have been said prior to 1892 of that area embraced now in the Swisher surveys. The private owner then recognized his lands must be located from the calls in the grants and hence sought the survey to determine those boundaries.

This writer has searched diligently for a case that would remotely authorize the construction applied by O'Sullivan and adopted by the majority, but none has been found and none is cited. The calls are in no wise limited or given specific application. The terms must be given their generally accepted meaning. Such calls have universally been construed to mean "adjacent to," "to abut on," etc. Such is the Dictionary definition. Webster's New International defines "front" in this sense as "land which faces or abuts on a piece of water, river, road, etc." "Fronting on a street," "fronting on the improvement," have reference to the boundary line between the street and the lot. Flynn v. Chiappari, 191 Cal. 139, 215 P. 682, at page 686(11). "Thirty rods front on the river," "thirty rods up the river," "down the river side," etc., are construed to include the land adjacent to the river. Proctor v. Maine Cent. R. Co., 96 Me. 458, 52 A. 933, last par. 936. "Down the river" means "with the river." Stover v. Gilbert, 112 Tex. 429, 247 S.W. 841, at page 843, and cases cited.

"French and Spanish conveyances, both public and private, the words 'face au fleuve,' 'face,' 'frente al rio,' 'frente,'— front to the river, or front,—exclusively designate estates bounded by the river."

La Branch's Heirs v. Montegut, 47 La. Ann. 674, 17 So. 247, at page 248, and cases cited.

Moreover, the construction adopted cannot be generally applied and is limited to isolated cases because the construction generally is mathematically and scientifically impossible. It is possible of application only when the boundary lines off of a stream, body of water, road, etc., are parallel. It need not be said that conveyance records are full of such calls for lines running other than parallel. ·

For the reasons briefly indicated in this particular only it occurs to the writer the O'Sullivan construction is arbitrary, inaccurate and impossible, and hence the judgments of the trial court and of the majority are in error in that particular.

## On Motions for Rehearing.

PRICE, Chief Justice.

The State, in connection with her motion for rehearing, has requested that the disposition of the motion be postponed until the Supreme Court has disposed of the case of State v. Balli et al., Tex.Civ.App., 173 S.W.2d 522. A careful examination of that case has convinced us that few of the issues involved here are involved in that case. In our opinion a prompt disposition by us of this motion will best subserve the interests of all parties to the appeal.

It has been called to our attention that, in connection with the statement with reference to the payment of taxes on the property involved since about 1879, we failed to mention that payments were not made on excess acreage. As we read the record, such is the case.

Further, in the original opinion, it was stated that the grants in the relevant area made to Power and Hewetson were in an early day declared invalid by the Supreme Court, citing the cases of Smith v. Power, 14 Tex. 146, and Smith v. Power, 23 Tex. 30. It was further stated that subsequent to these holdings applications to purchase were made in these areas, included in the grants to said empresarios; that in connection with these applications surveys were made by Surveyors Richardson and Talley and Surveyor Ward. These applications were made prior and not subsequent to the holding in the two cases above referred to.

As to the O'Sullivan survey, it may not be out of place to make this additional statement: The purpose or intention thereof unquestionably was to locate and describe the lands immediately north of the north line of the Hewetson headright grant. In order to carry out this intention it was necessary for O'Sullivan to locate the north line of the Hewetson grant. His interpretation and application of the calls for frontage on the two relevant creeks as to the system of survey, seem to be justified and required by the law of the State of Coahuila and Texas, by the interpretation of such law by the Supreme Court of Texas, and by the construction of the United States Supreme Court and the Supreme Court of California of ancient Spanish, Mexican or colonial grants. Likewise this seems to have been the interpretation placed on such calls by the early surveyors and the responsible officers of the governments making the grants. White v. Holliday, 11 Tex. 606; Welder v. Carroll, 29 Tex. 317; Tucker v. Smith, 68 Tex. 473, 3 S.W. 671; Corrigan v. State, 42 Tex.Civ.App. 171, 95 S.W. 95; Sullivan v. State, 41 Tex.Civ.App. 89, 95 S.W. 645; Schaeffer v. Berry, 62 Tex. 705; Kenedy Pasture Co. v. State, Tex.Civ.App., 196 S.W. 287; Land v. Dunn, Tex.Civ.App., 241 S.W. 580; Hicks v. Coleman, 25 Cal. 122, 85 Am.Dec. 103; Massie v. Watts, 6 Cranch 148, 3 L.Ed. 181; United States v. Sutherland, 19 How. 363, 15 L.Ed. 666.

In some, if not most, of the cases cited above the opinions are not specific as to construing a call for a stream frontage as a call for a base line. A careful reading of such cases will demonstrate, we think, that base lines rather than meandered lines were applied as establishing the survey or surveys involved. If frontage was based on a base line in the old surveys, in applying a call for such frontage to such survey, the use of a base rather than meandered line would seem to find justification. In this case such construction is fortified by over one hundred years of consistent recognition by the granting state, by the succeeding states, by the grantees and by the public. The recognition by the State of Coahuila and Texas is intrinsic in the descriptive terms of the grants. The calls for the two square leagues, for instance, could only be interpreted as calling for a base line frontage. Recognition by the public is to be inferred from the fact that, except in the cases

mentioned in the concurring and original opinions, applications to purchase did not infringe upon either the Hewetson or the Power headright, and so likewise as to the Hearn headright. The acts of recognition by the State of Texas and the successors in title to these two grants have been set forth at some length in the original opinion.

Independent of any inference of fact drawn from the lapse of time, coupled with the conduct of the State with reference to the grant of the preceding sovereign, O'Sullivan correctly located the north line of the Hewetson as coincidental with his monumented line for the south line of the Swisher Surveys.

For over one hundred years by unequivocal acts the north line of the Hewetson headright has been recognized in the position at least as far north as the position given it by the O'Sullivan Survey. There can be no safer evidence of its true location. Here, there is no good reason for a departure from that high good faith evidenced by the decisions of the courts of the Republic and the States in dealing with the grants of the superseded sovereign. Here, a title is asserted that was never before asserted until the filing of the intervention in 1942. This assertion repudiates the act of every Land Commissioner from the days of the Republic to the present time. The State now claims title after she has disclaimed for almost one hundred years. Were it necessary, there is ample evidence here to presume a grant—grants from the State of Coahuila and Texas, grants in conformity with the location of the north line of the Hewetson by O'Sullivan. Texas-Mexican R. Co. v. Uribe, 85 Tex. 386, 20 S.W. 153. It would hardly be consistent for the courts of Texas to give a different legal effect to the acts of her high officers than to those of the officials of a superseded government. This seems to hold true where the official acts of the officers of the State were in the light of the official acts of the officers of the superseded government.

James Power, James Hewetson, Victor Loupy, and perhaps every other person who resided near these grants at or about the time same were made, are dead. There is no living person who can testify as to just what was done in consummation thereof. When attack is made at this late date every lawful presumption should be made in favor of their validity. If this be not

true, time and development of land may tend to make the title thereto insecure rather than more secure. The land in question was titled before the Republic came into existence, and is such today.

A careful reconsideration of the entire case has convinced the majority that the disposition thereof was correct.

It is ordered that the motion for rehearing be in all things overruled.